1   Benjamin J. Siegel (SBN 256260)            Jeanifer E. Parsigian (SBN 289001)
    HAGENS BERMAN SOBOL SHAPIRO LLP           WINSTON & STRAWN LLP
2   715 Hearst Avenue, Suite 202              101 California Street
    Berkeley, CA 94710                        San Francisco, CA 94111
3   Telephone: (510) 725-3000                 Telephone: (415) 591-1000
    Facsimile: (510) 725-3001                 Facsimile: (415) 591-1400
4   bens@hbsslaw.com                          jparsigian@winston.com

5   Steve W. Berman (*pro hac vice* forthcoming)   Jeffrey L. Kessler (*pro hac vice* forthcoming)
    Emilee N. Sisco (*pro hac vice* forthcoming)   David L. Greenspan (*pro hac vice* forthcoming)
6   Stephanie A. Verdoia (*pro hac vice*       Adam I. Dale (*pro hac vice* forthcoming)
    forthcoming)                              200 Park Avenue
7   1301 Second Avenue, Suite 2000            New York, NY 10166-4193
    Seattle, WA 98101                         Telephone: (212) 294-4698
8   Telephone: (206) 623-7292                 Facsimile:  (212) 294-4700
    Facsimile:  (206) 623-0594                jkessler@winston.com
9   steve@hbsslaw.com                         dgreenspan@winston.com
    emilees@hbsslaw.com                       aidale@winston.com
10  stephaniev@hbsslaw.com

11  *Counsel for Plaintiffs and*
    *the Proposed Class*
12

13                  **UNITED STATES DISTRICT COURT**

14                  **NORTHERN DISTRICT OF CALIFORNIA**

15                        **OAKLAND DIVISION**

16

17
    CHUBA HUBBARD and KEIRA            | **Case No.**
18  MCCARRELL, on behalf of themselves |
    and all others similarly situated, |
19                                     | COMPLAINT
               Plaintiffs,             |
20                                     |
          v.                           | CLASS ACTION
21                                     |
    NATIONAL COLLEGIATE ATHLETIC       |
22  ASSOCIATION; ATLANTIC COAST        | **DEMAND FOR JURY TRIAL**
    CONFERENCE; THE BIG TEN            |
23  CONFERENCE, INC.; THE BIG 12       |
    CONFERENCE, INC.; PAC-12           |
24  CONFERENCE; and SOUTHEASTERN       |
    CONFERENCE,                        |
25                                     |
               Defendants.            |
26

27

28

                                     1

1       For their Complaint against Defendants National Collegiate Athletic Association ("NCAA"),

2  Atlantic Coast Conference ("ACC"), Big Ten Conference, Inc. ("Big Ten"), Big 12 Conference, Inc.

3  ("Big 12"), Pac-12 Conference ("Pac-12"), and Southeastern Conference ("SEC"), Plaintiffs, on their

4  own behalf and on behalf of all others similarly situated, allege as follows:

5                              **I.      INTRODUCTION**

6      1.      In its March 8, 2019 decision in *In re NCAA Grant-in-Aid Cap Antitrust Litigation*, this

7  Court held that NCAA rules prohibiting NCAA member schools from offering education-related

8  compensation, including cash payments of up to $5,980 in "academic or graduation awards or

9  incentives" (hereinafter, "Academic Achievement Awards"), violated the antitrust laws.  Specifically,

10  this Court found that the NCAA is subject to the antitrust laws like every other business engaged in

11  interstate commerce, that the NCAA's members are monopsony buyers of college athletes' services,

12  that the NCAA's restraints on education-related compensation inflicted significant anticompetitive

13  effects in the relevant labor markets with no procompetitive justification, and that there were viable

14  less restrictive alternatives to those restraints.  375 F. Supp. 3d 1058 (N.D. Cal. 2019).  The Supreme

15  Court unanimously upheld the decision.  *NCAA v. Alston*, 141 S. Ct. 2141 (2021).

16      2.      On August 12, 2020—after this Court's injunction in *Grant-in-Aid Cap* took effect—

17  the NCAA adopted Bylaw 16.1.4.5 to permit men's and women's basketball and bowl subdivision

18  football players to receive Academic Achievement Awards in an amount up to $5,980 each academic

19  year.

20      3.      On October 6, 2021—following the Supreme Court's decision in *Alston*—the NCAA

21  revised Bylaw 16.1.4.5 to allow *all* Division I college athletes to receive Academic Achievement

22  Awards in an amount up to $5,980 each academic year.

23      4.      This Court's injunction unlocked life-changing benefits for NCAA Division I athletes.

24  The injunction did not *require* schools to pay Academic Achievement Awards, but with the

25  anticompetitive prohibition removed, competition for the services of Division I athletes led colleges

26  to do so.  Indeed, within weeks of the Supreme Court's *Alston* decision, the University of Mississippi

27  announced that it would provide $5,980 Academic Achievement Awards on a going-forward basis to

28  *all athletes* who maintained academic eligibility.  Dozens of Division I colleges and universities

quickly followed suit—for the most part making Academic Achievement Awards available to all of their athletes.

5.      Plaintiffs, and the members of the Class who they seek to represent, were not members of the *Grant-in-Aid Cap* damages settlement classes, which this Court approved in March 2017. Instead, they are current and former Division I college athletes whose damages claims were not litigated in the *Grant-in-Aid Cap* case, but who were damaged by the anticompetitive restrictions on Academic Achievement Awards.

6.      While the *Grant-in-Aid Cap* injunction was of great significance, it did not rectify the damages suffered by thousands of Division I athletes who went to schools that have since decided to offer Academic Achievement Awards following changes to NCAA bylaws that unlawfully prohibited them.  In a competitive market, Plaintiffs and the Class members they seek to represent would have received up to $5,980 per year in Academic Achievement Awards.  Plaintiffs aim to recover damages for those injuries here.  Notably, thousands of Class members play (or played) sports *other than* football and basketball and will directly benefit from this action.

7.      Defendants' agreements to price-fix players' compensation to exclude Academic Achievement Awards violated Section 1 of the Sherman Act, 15 U.S.C. § 1.  *Alston* established that these agreements were antitrust violations as a matter of law.  Plaintiffs here may invoke established principles of collateral estoppel such that only the amount of damages inflicted upon Plaintiffs and the Class by Defendants' antitrust violation needs to be further adjudicated.

8.      Specifically, because each Defendant in this case had the full and fair opportunity to litigate the Section 1 liability issues in *Grant-in-Aid Cap*, including whether Defendants' rules prohibiting Academic Achievement Awards caused anticompetitive effects, whether there were procompetitive justifications for their anticompetitive agreements, and whether there were less restrictive alternatives, the doctrine of collateral estoppel precludes Defendants from relitigating those issues again here.

9.      And this Court's *Grant-in-Aid Cap* decision makes clear that, when it comes to restrictions on Academic Achievement Awards, playing a different sport from FBS football or Division I basketball is a distinction without any difference.  As this Court explained, because, under

CLASS ACTION COMPLAINT

the NCAA's own rules, it was "consistent with amateurism and the preservation of the distinction between college and professional sports" to allow all Division I athletes to receive cash-equivalent awards of up to $5,980 per year for *athletic* performance, there was no valid justification for prohibiting awards for *academic* performance in the same amount. 375 F. Supp. 3d at 1089. Nothing about this reasoning was specific to the sports of basketball or football. To the contrary, this analysis applies with equal force across *all* Division I sports.

10.     Alternatively, because the federal judiciary has "considerable experience with the type of restraint at issue" here—namely, Defendants' prohibition on education-related benefits, including Academic Achievement Awards—and "can predict with confidence that it would be invalidated in all or almost all instances," Defendants' agreements can be condemned as either *per se* illegal or with a mere "quick look."

11.     As a result of Defendants' anticompetitive agreements, Plaintiffs and other similarly situated current and former college athletes did not receive the Academic Achievement Awards that they would have received in a competitive market and are therefore entitled to treble damages for these antitrust injuries.

12.     "The NCAA is not above the law." *Alston*, 141 S. Ct. at 2169 (Kavanaugh, J., concurring). Defendants therefore are required to compensate Plaintiffs and the Class they seek to represent for Defendants' unlawful actions.

## II.     JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

13.     **Jurisdiction.** This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. The Court also has jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some of the members of the proposed class are citizens of a state different from the Defendants.

14.     This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletics contests throughout the United States, including in this District; (c)

had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Numerous NCAA Division I universities or colleges also are found within this District, *i.e.*, the University of California–Berkeley, Stanford University, Santa Clara University, the University of San Francisco, and St. Mary's College.  And Defendant Pac-12 is headquartered in this District.

15.  **Venue.**  Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391 and 15 U.S.C. § 22.

16.  **Divisional Assignment.**  This action arises in Alameda County or San Francisco County because that is where a substantial part of the events that give rise to the claims occurred.  Within Alameda County is found the University of California Berkeley ("Cal") campus.   Cal, for example, fields 31 Division I intercollegiate sports teams, 24 of which compete in the Pac-12.  Current and former Cal athletes have been subjected to the violations described herein.  Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or to the Oakland Division.

### III.    PARTIES

**A.    Plaintiffs**

**1.    Chuba Hubbard**

17.  Plaintiff Chuba Hubbard is a resident of Charlotte, North Carolina and a former Division I athlete who competed for the Oklahoma State University ("OSU") football team.

18.  Hubbard was a four-star recruit and the top high school player in Canada according to ESPN.com.  He was recruited by numerous Division I schools, including several from the Power Five Conferences, and received multiple full athletic scholarship offers for his football talents.

19.  In the fall of 2017, Hubbard became a student with a full athletic scholarship to play football at OSU, a Division I member of the NCAA and the Big 12, located in Stillwater, Oklahoma. He continued to receive a full athletic scholarship through the 2020–21 FBS season, after which he left OSU to play professionally in the National Football League.

20.     The monetary amount of Hubbard's athletic scholarship was limited to the "cost of attendance" at OSU as required under the rules agreed upon by Defendants and their member institutions. Hubbard was eligible to receive up to $5,980 per academic year for *athletic* achievement, but Defendants' rules forbade Hubbard from receiving the same compensation for *academic* accomplishments.

21.     During his time at OSU, Hubbard excelled both on the football field and in the classroom. In 2019, Hubbard was a unanimous All-American, the Big 12 Offensive Player of the Year, a finalist for the Walter Camp Player of the Year Award and one of three national finalists for the Doak Walker Award presented to the nation's top running back. He also finished eighth in the voting for the Heisman Trophy. The same year, he received special recognition from OSU for his academic accomplishments and was included on the Dean's Honor Roll. And in 2020, Hubbard was named First Team Academic All-Big 12 and to the Allstate American Football Coaches Association Good Works Team.

22.     On March 9, 2022, OSU announced that it would begin awarding athletes $5,980 per year in Academic Achievement Awards.[1] OSU's press release explained that "[t]he Alston decision granted universities the option to provide college athletes with additional education related benefits including direct financial support in the form of academic achievement awards, up to the legally established maximum of $5,980 per year." At OSU, "all scholarship student-athletes will receive the legally established maximum of $5,980 per year."

23.     Thus, as a direct result of the NCAA rules prohibiting OSU from offering such payments sooner—rules that have since been determined to violate the antitrust laws—Hubbard was deprived of receiving the $5,980 Academic Achievement Awards that he would have earned each year that he attended OSU.

**2.     Keira McCarrell**

24.     Plaintiff Keira McCarrell is a resident of Auburn, Alabama and a former Division I athlete who competed for the University of Oregon and Auburn University track & field teams.

---

[1] *OSU Announces POSSE Star Fund For Student-Athletes*, OKLA. STATE UNIV. (Mar. 9, 2022), https://okstate.com/news/2022/3/9/baseball-osu-announces-posse-star-fund-for-student-athletes.

25. Before college, McCarrell was a highly recruited star athlete. McCarrell received athletic scholarship offers from numerous top Division I programs, including the University of Oregon, University of Oklahoma, University of Kansas, and University of Illinois. She ultimately accepted the offer from the University of Oregon, a Division I member of the NCAA and the Pac-12 Conference located in Eugene, Oregon, and enrolled in school starting in the fall of 2017.

26. As a freshman, McCarrell placed 10th in the javelin throw at the Pac-12 Championships and went on to compete at the NCAA Championships. In addition to interscholastic competition, McCarrell also competed with Team Canada at the 2018 IAAF World U20 Championships in Tampere, Finland where she placed 19th in the javelin with a mark of 47.85 meters.

27. As a sophomore, McCarrell finished eighth in the heptathlon and eleventh in the javelin at the Pac-12 Championships. That year she earned a bid to the NCAA Championships for the second time, ultimately finishing 17th in the javelin.

28. In the fall of 2019, McCarrell transferred to Auburn University, a Division I member of the NCAA and Southeastern Conference (SEC) located in Auburn, Alabama, where she received a full athletic scholarship and competed for the Tigers for three years, concluding with the 2022 outdoor track & field season.

29. During her time at the University of Oregon and first two years at Auburn, the monetary amount of McCarrell's athletic scholarship was limited to the "cost of attendance" as required under the rules agreed upon by Defendants and their member institutions. McCarrell was eligible to receive up to $5,980 per academic year for *athletic* achievement, but Defendants' rules forbade McCarrell from receiving the same compensation for *academic* accomplishments.

30. McCarrell was both an outstanding collegiate athlete and an excellent student. As a junior, she was named the female recipient of the 2021 PNC Achievers Award for her achievement in leadership, academic success, community engagement, and athletic competition. As a senior, she was the 2022 nominee for the H. Boyd McWhorter Post-Graduate Scholarship, which is presented each year by the SEC to the league's top male and female scholar athletes. McCarrell was also an Academic All-American and was named to the SEC's Academic Honor Roll before graduating *cum laude* in May 2022 and continuing on to pursue a graduate degree in Exercise Science with a focus in Biomechanics.

31.     At the end of 2021, Auburn announced to its Student-Athlete Advisory Committee that it wanted to be one of the first schools to provide Academic Achievement Awards to all of its athletes and had plans to start rolling out payments at the beginning of the following semester.  In February 2022, Auburn started issuing Academic Achievement Awards to its athletes, including McCarrell.

32.     Following *Alston*, the University of Oregon also began providing Academic Achievement Awards starting with the 2021–22 academic year.  Oregon pays the maximum $5,980 per year in Academic Achievement Awards to all athletes who maintain academic good standing under NCAA, Pac-12, and university rules and comply with the university's student conduct policy.[2]

33.     Thus, as a direct result of the NCAA rules prohibiting Oregon and Auburn from offering such payments sooner—rules that have since been determined to violate the antitrust laws—McCarrell was deprived of receiving the Academic Achievement Awards that she would have earned each year that she attended Oregon and the first two years that she attended Auburn.

**B.     Defendants**

    **1.     National Collegiate Athletic Association ("NCAA")**

34.     The NCAA is an unincorporated association of more than 1,200 colleges, universities, and athletic conferences located throughout the United States.  The NCAA maintains its principal place of business at 700 W. Washington Street, Indianapolis, Indiana 46204.  The NCAA is engaged in interstate commerce in the business of, among other things, governing the big business of top-tier college football and men's basketball in the United States, as well as owning and operating the multi-billion-dollar NCAA Division I Men's Basketball Championship and College Football Playoff.

35.     The NCAA was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

---

[2] Andy Wittry, *Oregon athletes earn $2.6 million in academic financial awards*, On3 (July 11, 2022), https://www.on3.com/news/university-oregon-ducks-academic-financial-awards-ncaa-v-alston-payments-compensation/.

### 2.  Atlantic Coast Conference ("ACC")

36.    The Atlantic Coast Conference ("ACC") is an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 4512 Weybridge Lane, Greensboro, North Carolina 27407.

37.    During the 2018-19 academic year, the ACC's members were the following 15 institutions: Boston College, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), North Carolina State University, Syracuse University, the University of Louisville, the University of Miami, the University of North Carolina, the University of Notre Dame,[3] the University of Pittsburgh, the University of Virginia, Virginia Polytechnic Institute and State University ("Virginia Tech"), and Wake Forest University.

38.    The ACC was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

### 3.  Big Ten Conference, Inc. ("Big Ten")

39.    The Big Ten Conference, Inc. ("Big Ten") is a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 5440 Park Place, Rosemont, Illinois 60018.

40.    During the 2018-19 academic year, the Big Ten's members were the following 14 institutions: University of Illinois at Urbana Champaign, Indiana University, University of Iowa, University of Maryland, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, Rutgers University, and the University of Wisconsin–Madison.

---

[3] All of Notre Dame's athletics programs compete in the ACC with the exceptions of football (which is independent) and men's ice hockey (which competes in the Big Ten).

41.     The Big Ten was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

**4.      Big 12 Conference, Inc. ("Big 12")**

42.     The Big 12 Conference, Inc. ("Big 12") is a corporation organized under the laws of Delaware that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 400 East John Carpenter Freeway, Irving, Texas 75062.

43.     During the 2018-19 academic year, the Big 12's members were the following 10 institutions: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas–Austin, Texas Christian University, Texas Tech University, and West Virginia University.

44.     The Big 12 was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

**5.      Pac-12 Conference ("Pac-12")**

45.     The Pac-12 Conference ("Pac-12") is an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 360 3rd Street, San Francisco, California 94107.

46.     During the 2018-19 academic year, the Pac-12's members were the following 12 institutions: University of Arizona, Arizona State University, University of California–Berkeley, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California–Los Angeles, University of Southern California, University of Utah, University of Washington, and Washington State University.

47.     The Pac-12 was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA

member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

**6.      Southeastern Conference ("SEC")**

48.      The Southeastern Conference ("SEC") is an unincorporated association that identified itself, as of 2011, as a tax-exempt organization under Section 501(c)(3) of the U.S. Internal Revenue Code, with its principal place of business at 2201 Richard Arrington Jr. Boulevard North, Birmingham, Alabama 35203.

49.      During the 2018-19 academic year, the SEC's members were the following 14 institutions: University of Alabama, University of Arkansas, Auburn University, University of Florida, University of Georgia, University of Kentucky, Louisiana State University, University of Mississippi, Mississippi State University, University of Missouri, University of South Carolina, University of Tennessee, Texas A&M University, and Vanderbilt University.

50.      The SEC was a party to *Grant-in-Aid Cap*—through its affirmance by the Supreme Court—which enjoined the NCAA's education-related compensation restraints and permitted NCAA member schools to offer, among other things, Academic Achievement Awards in an amount up to $5,980 per year.

51.      Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five" or "Conference Defendants."

52.      Whenever in this Complaint Plaintiffs make reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

**C.      Co-Conspirators**

53.      Various persons, firms, corporations, organizations and other business entities, some unknown and others known, participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint.  Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes.  Representatives of those schools and conferences voted

11

CLASS ACTION COMPLAINT

to adopt the rules illegally capping the education-related compensation that players could receive for their athletic services and thus agreed to impose the restraints on trade described herein.  All Division I schools and conferences benefitted from those restraints of trade by virtue of their agreement to abide by the restraints.

### IV.     NATURE OF INTERSTATE TRADE AND COMMERCE

54.     Defendants and/or their member institutions were and continue to be engaged in the business of governing and/or operating major college sports businesses, including the sale of tickets and telecast rights to the public for the exhibition of the individual and collective talents of players such as Plaintiffs.  To conduct these businesses, the Defendants' member institutions would, absent the restrictions at issue in this action, compete with each other for the services of athletes, such as Plaintiffs, who are recruited to perform services as players for the various member institutions of the Defendants.

55.     Defendants' and their member institutions' operation of and engagement in the respective businesses of college sports involves a substantial volume of interstate trade and commerce, including, inter alia, the following interstate activities: travel; communications; purchases and movement of equipment; broadcasts of games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of coaches and administrative personnel; employment of referees; and negotiations for all of the above.

56.     Defendants' and their member institutions' aforesaid interstate transactions involve billions of dollars in collective annual expenditures and receipts.

57.     Plaintiffs were recruited by and enrolled at one or more of the Defendants' member institutions in interstate commerce as collegiate athletes.

### V.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

58.     The anticompetitive agreements challenged here, which were struck down in *Grant-in-Aid Cap*, were neither secret, nor in dispute.  Rather, they were documented and published in the NCAA Division I Manual[4] (the NCAA's rule book) and the rulebooks of each of the Conference

---

[4] Unless otherwise indicated, all references to the NCAA Constitution or NCAA Bylaws herein refer

Defendants.  As this Court found, and the Supreme Court affirmed, those rules constituted horizontal agreements in that they were proposed, drafted, voted upon, and agreed upon by NCAA members, including all of the Conference Defendants, that compete with each other for the services of top-tier college athletes.  The anticompetitive rules were also strictly enforced, so that member institutions had no choice but to comply with them or face penalties.

59.     NCAA Constitution Article 5.01.1 provided, "All legislation of the Association that governs the conduct of the intercollegiate athletics programs of its member institutions shall be adopted by the membership in Convention assembled."  Additionally, NCAA Constitution Article 3.2.4.1 provided that members "agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation of the Association."

60.     Plaintiffs bring this suit to recover damages for the NCAA and Conference Defendants' illegal agreements that prohibited players from receiving Academic Achievement Awards.  These agreements were enumerated through a web of interrelated NCAA and Conference Defendant rules and bylaws, including but not limited to:

      a.  Bylaw 15.01.6, which stated that "An institution shall not award financial aid to a student-athlete that exceeds the cost of attendance that normally is incurred by students enrolled in a comparable program at that institution (see Bylaw 15.1), except as specifically authorized by NCAA legislation."

      b.  Bylaw 15.1, which stated that "A student-athlete shall not be eligible to participate in intercollegiate athletics if the student-athlete receives financial aid that exceeds the value of the cost of attendance as defined in Bylaw 15.02.2."

      c.  Bylaw 15.02.2, which defined "cost of attendance" as "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution."

---

to the provisions set forth in the 2018-19 NCAA Division I Manual, available at https://www.ncaapublications.com/p-4547-2018-2019-ncaa-division-i-manual-august-version-available-august-2018.aspx.

   d.   Bylaw 16.01.2, which stated that "A student-athlete shall not receive any extra benefit. Receipt by a student-athlete of an award, benefit or expense allowance not authorized by NCAA legislation renders the student-athlete ineligible for athletics competition in the sport for which the improper award, benefit or expense was received. If the student-athlete receives an extra benefit not authorized by NCAA legislation, the individual is ineligible in all sports."

61.   The Conference Defendants, as NCAA members, agreed to the rules cited above and codified their own rules, which were allowed to be more restrictive, but not more liberal, than NCAA rules.  As of the 2018-19 academic year, Conference Defendants' rules evidencing agreements among conference members to restrain competition for player services included:

   a.   ACC Constitution Article II ("General Purpose"): "The Conference aims to … (e) Coordinate and foster compliance with Conference and NCAA rules."

   b.   ACC Bylaw Article II ("NCAA Regulations"): "Member institutions are bound by NCAA rules and regulations, unless Conference rules are more restrictive."

   c.   Big Ten Bylaw 14.01.3 ("Compliance with NCAA and Conference Legislation"): "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."

   d.   Big 12 Bylaw 1.3.2 ("Adherence to NCAA Rules"): "All Members of the Conference are committed to complying with NCAA rules and policies. . . . In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference."

   e.   Big 12 Bylaw 6.1 ("Eligibility Rules"): "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically-related aid, practice, and/or competition in any intercollegiate sport."

   f.   Big 12 Bylaw 6.5.3 ("Financial Aid Reports"): "Each institution shall comply with all financial aid legislation of the NCAA and the Conference."

g. Pac-12 Bylaw 4.2 ("Application of NCAA Legislation"): "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."

h. Pac-12 Executive Regulation 3-1: "The rules of the [NCAA] shall govern all matters concerning financial aid to student-athletes . . . ."

i. SEC Constitution, Article 5.01.1 ("Governance"): "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."

j. SEC Bylaw, Article 15.01 ("General Principles"): "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations."

62. Defendants' agreements were strictly enforced to punish any NCAA members that did not adhere completely to the letter of these restraints. NCAA Constitution Article 1.3.2 provided, "Member institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." Additionally, NCAA Constitution Article 2.8.3 provided, "An institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association." Accordingly, all NCAA members were forced to abide by the illegal restraints as co-conspirators with Defendants or face punishment.

63. Formalized enforcement procedures were codified in Bylaw 19 of the NCAA Division I Manual. Bylaw 19.01.2 provided, "The enforcement program shall hold institutions, coaches, administrators and student-athletes who violate the NCAA constitution and bylaws accountable for their conduct, both at the individual and institutional levels."

64. Central to enforcement was the requirement that NCAA institutions report any instance of noncompliance. More than 3,000 "secondary" violations (now known as Level 3 and 4 violations) were reported by member institutions each year. Additionally, the NCAA employed approximately 60 full-time staff members in its enforcement department to investigate NCAA rules violations and bring charges against schools and athletes. Penalties included fines, scholarship reductions, recruiting

1  restrictions, and even a "death penalty" in which a school was banned from competing in a sport for a

2  year or more.

3        65.     After this Court's injunction in *Grant-in-Aid Cap* became effective, the NCAA adopted

4  Bylaw 16.1.4.5, on August 12, 2020, to comply with the injunction and permit schools to offer

5  Academic Achievement Awards to FBS football and Division I men's and women's basketball

6  players.   After the Supreme Court's unanimous *Alston* decision, this NCAA bylaw was revised, on

7  October 6, 2021, to allow schools to pay Academic Achievement Awards to Division I college athletes

8  in all sports.   The bylaw currently states that "The NCAA, a conference or an institution may provide

9  a student-athlete an academic or graduation award or incentive that has a value up to the maximum

10  value of awards an individual student-athlete could receive in an academic year in participation,

11  championship and special achievement awards (combined) listed in Figures 16-1, 16-2, and 16-3,"

12  i.e., up to $5,980 per year.[5]

13              **VI.     ANTICOMPETITIVE HARM IN THE RELEVANT MARKETS**

14        66.     To the extent the rule of reason applies to Plaintiffs' claims, the relevant markets are

15  the nationwide markets for the labor of NCAA Division I college athletes in the various sports in

16  which they compete.   In these labor markets, current and prospective athletes compete for roster spots

17  on the various Division I athletic teams.   NCAA Division I member institutions compete to recruit and

18  retain the best players by offering unique bundles of goods and services including scholarships to

19  cover the cost of attendance, education related benefits (including Academic Achievement Awards),

20  as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment,

21  and opportunities to compete at the highest level of college sports, often in front of large crowds and

22  television audiences.   In exchange, athletes provide their athletic services and maintain minimum

23  academic achievements.

24        67.     All of the colleges and universities in Division I, which the NCAA itself defines as the

25  highest level of competition in college sports, competed in the relevant labor market for each sport in

26  which the institution fielded a varsity team.   For decades, NCAA institutions have ferociously

27

28  [5] 2022-23 NCAA Division I Manual, available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx.

competed with each other for the services of athletes, but only within the constraints of the rules that prohibit any financial compensation to athletes beyond the price-fixed limits set by the NCAA and its conferences.

68.     By the time of *Grant-in-Aid Cap*, the demand for collegiate athletes' services was greater than ever, and still growing.  Competitor institutions boasted of their sustained athletic success and notable alumni who play or have played professionally or in the Olympic games. Coaches bombarded athletes with handwritten letters, sometimes sending dozens of letters in one day. And, perhaps most visibly, Power Five Conference schools were locked in an "arms race" to appeal to recruits by spending lavishly on everything but direct compensation and prohibited education-related benefits to athletes, including expanded stadiums and arenas, luxury locker rooms and training facilities, high-end dorms, and specialized tutoring centers.  The Power Five Conference schools also spent millions of dollars on coaches, while prohibiting athletes from receiving Academic Achievement Awards beyond their NCAA-capped "scholarships."  As monopsony buyers in these labor markets, the NCAA and its members had (and still have) the ability to control price and exclude competition. All NCAA members agree to utilize and abide by the NCAA's bylaws, including the provisions detailed herein, which were (and are) used by the NCAA and its members to fix the prices at which college athletes were able to be paid for their athletic services.  The NCAA and its members had (and have) the power to exclude from these markets any member who was found to violate its rules.

69.     The NCAA imposed a wide variety of restraints on athletes as a condition for their being able to play for a Division I team.  For example, athletes were prohibited from receiving compensation beyond educational expenses approved by the NCAA; were required to meet minimum benchmarks for educational progress; and were strictly limited in their ability to receive compensation for any services that might be understood to reflect on their athletic ability or reputation.  Of specific relevance here, athletes were prohibited from receiving cash Academic Achievement Awards in any amount until the injunction in *Grant-in-Aid Cap* went into effect.

70.     Athletes would have received Academic Achievement Awards but for Defendants' prohibition on such compensation.  The fact that the athletes had no choice but to attend schools subject

to these anticompetitive restrictions further demonstrated the market power of the NCAA and its members in the relevant labor markets for Division I athletes.

71.    There were (and are still) no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the relevant labor markets.  No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I.  Schools in NCAA Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety.  Schools in NCAA Division III do not provide any athletic scholarships at all and offer an even lower level of competition.  The National Intercollegiate Athletic Association (NAIA), National Junior College Athletic Association (NCCAA), and United States Collegiate Athletic Association (USCAA) likewise provide less scholarship money and offer a much lower level of competition.  And schools in these other divisions and associations are often smaller than Division I schools, spend far less resources on athletics, and many do not even provide the opportunity to attend a four-year college.

72.    Nor are equivalent labor market opportunities offered by the professional leagues.  For example, the National Football League (NFL), the National Basketball Association (NBA) and Women's National Basketball Association (WNBA) prohibit players from entering the league immediately after high school.  And, although some minor leagues and professional leagues in other sports (to the extent that there are such leagues in a given sport) do permit athletes to compete immediately after high school, recruits rarely forego opportunities to play Division I sports in order to play professionally because of the unique combination of opportunities which only Division I schools can offer.  The qualitative differences between the opportunities offered in NCAA Division I, including the opportunity to receive a college education, and those offered by other sports leagues demonstrate that Division I schools operate in distinct labor markets for their athletes.

73.    Because Division I schools are the only suppliers in the relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the price of labor.  They exercise this power by enacting collectively agreed-to, horizontal rules that strictly limit the compensation and terms of employment for Division I athletes.  Until Bylaw 16.1.4.5 was enacted, Division I schools enforced uniform rules prohibiting any cash payments for Academic Achievement

Awards.  If any school sought to depart from these fixed employment terms, that school would have been subject to sanctions or expulsion by the NCAA.

74.     The agreement to abide by the NCAA's rules was anticompetitive because, among other things, it blocked schools' efforts to compete freely for college players.  As shown by the natural experiment that followed the NCAA changing its rules to permit payment of Academic Achievement Awards, absent these nationwide restraints, Division I conferences and schools would have been competing amongst each other to pay the highest amount of permitted Academic Achievement Awards, *i.e.*, up to $5,980 each academic year.

75.     The economic harm to Division I athletes from the NCAA's restraints is indisputable. The Plaintiffs here, and the Class members they seek to represent, each attended schools which chose to compete for athletes by offering Academic Achievement Awards once freed of the NCAA's restrictions.  But because of the restraints which then existed, these young men and women—often from socio-economically disadvantaged backgrounds—were deprived of the Academic Achievement Awards they would have been paid absent Defendants' unlawful restraints.

76.     In light of these facts, this Court in *Grant-In-Aid Cap* held that "because elite student-athletes lack any viable alternatives to [D1], they are forced to accept, to the extent they want to attend college and play sports at an elite level after high school, whatever compensation is offered to them by [D1] schools, regardless of whether any such compensation is an accurate reflection for the competitive value of their athletic services." 375 F. Supp. 3d at 1070.  Defendants did not even try to dispute the Court's findings about their market power in the relevant markets on appeal, and the Ninth Circuit found them to "have substantial support in the record."  *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256–57 (9th Cir. 2020) ("*Grant-in-Aid Cap II*").

77.     Indeed, after Defendants' rules prohibiting Academic Achievement Awards were eliminated in response to the *Grant-in-Aid Cap* injunction and decision in *Alston*, dozens of NCAA member schools began offering Academic Achievement Awards.  Today, there are more than 50 such schools, with additional schools planning to offer these payments as time progresses, and the popularity of college sports has continued to flourish.

78.     Because the *Grant-in-Aid Cap* litigation provided each Defendant here the full and fair opportunity to litigate the issue of whether their rules permitting athletic achievement awards while prohibiting the payment of Academic Achievement Awards violated the Sherman Act, under principles of collateral estoppel, the final judgment in *Grant-in-Aid Cap*, as affirmed by the Ninth Circuit and the Supreme Court, precludes Defendants from relitigating that issue here.

## VII.   THERE WERE NO PROCOMPETITIVE JUSTIFICATIONS FOR DEFENDANTS' ANTICOMPETITIVE AGREEMENTS

79.     In *Grant-in-Aid Cap*, Defendants proffered two procompetitive benefits that allegedly justified their restraints on education-related compensation, including their prohibition on Academic Achievement Awards: that the restraints implemented the principle of "amateurism," which they claimed was essential to preserving consumer demand for college sports; and that the restraints supported the "integration" of college athletes within their academic communities.  Defendants had the opportunity to present any other asserted procompetitive justification for these restraints in *Grant-in-Aid Cap*, but they chose not to do so at trial.[6]

80.     In extensive findings of fact, this Court found that the NCAA has abandoned "any coherent definition of amateurism."  *Grant-in-Aid Cap*, 375 F. Supp. 3d at 1074.  While the Court acknowledged that certain NCAA-imposed restrictions may have a potential procompetitive effect "to the extent that they serve to support the distinction between college sports and professional sports" by prohibiting "unlimited payments unrelated to education, akin to salaries seen in professional sports leagues," there was no justification for restraints on "education-related benefits," including Academic Achievement Awards.  *Id.* at 1082–83.

81.     The Court also held that Defendants could not demonstrate that limits on compensation were procompetitive due to any claimed effect on promoting integration.  *Id.* at 1086.

82.     The Court rejected Defendants' attempt to justify their prohibition on Academic Achievement Award payments in part because the NCAA was *permitting* Division I members to

---

[6] "Two additional pro-competitive justifications [for Defendants' compensation rules] had been offered earlier [in *Grant-in-Aid Cap*]: increased output and competitive balance.  These were rejected by the Court on summary judgment."  *See Grant-in-Aid Cap*, 375 F. Supp. 3d at 1070 n. 12.  Defendants did not appeal that decision.  *See Grant-in-Aid Cap II*, 958 F.3d at 1257 ("On appeal, [Defendants] advance[] a single procompetitive justification: The challenged rules preserve 'amateurism' . . .").

1    reward athletes across all sports for their *athletic* accomplishments.  For example, athletes could

2    receive "Visa gift cards" containing "several thousand dollars in cash-equivalent compensation if they

3    perform[ed] well enough in their sport" as well as access to "gift suites" where athletes could "select

4    from a variety of gifts" including "prepaid debit cards from stores such as Best Buy, iPad minis,

5    speakers, watches, and headphones." *Grant-in-Aid Cap*, 375 F. Supp. 3d at 1071–72 & n.13.  As the

6    Court explained, because this level of compensation for *athletic* performance was, by the NCAA's

7    own standards, "not demand-reducing or inconsistent with NCAA amateurism," the NCAA could not

8    reasonably contend that allowing the same level of compensation for *academic* performance would be

9    demand-reducing or inconsistent with amateurism either.  *See id.* at 1106.

10           83.    The Court's rulings on the absence of any procompetitive justification were twice

11   affirmed, first by the Ninth Circuit and then by the unanimous Supreme Court.  *Grant-in-Aid Cap II*,

12   958 F.3d 1239 (9th Cir. 2020); *NCAA v. Alston*, 141 S. Ct. 2141 (2021).

13           84.    Because each Defendant had the full and fair opportunity to litigate the issue of whether

14   there was any procompetitive justification for their rules prohibiting the payment of Academic

15   Achievement Awards in the *Grant-in-Aid Cap* litigation, under principles of collateral estoppel, the

16   final judgment in *Grant-in-Aid Cap*, as affirmed by the Ninth Circuit and the Supreme Court, precludes

17   Defendants from relitigating that issue here.

18           85.    Should the Court permit Defendants to relitigate these issues, and it should not, any

19   argument that banning Academic Achievement Awards preserved consumer demand for college sports

20   fails as a matter of law.  Any arguable procompetitive benefit of from banning such compensation

21   would only be felt in any product markets for college sports, not the relevant labor markets at issue

22   here.

23           86.    As the Ninth Circuit explained, "[i]t is not settled" whether courts may "consider a

24   restraint's procompetitive benefits in a market outside the market deemed relevant for the purpose of

25   evaluating a restraint's anticompetitive effects." *Grant-in-Aid Cap II*, 958 F.3d at 1257.  Because the

26   issue was not raised by parties in that case, it was not addressed by the Court either.  *Id.*  But,

27   concurring in the decision, Judge Smith wrote that "the underlying purpose of the Sherman Act—

28   promoting competition—counsels in favor of conducting a more limited Rule of Reason analysis,"

confined to the market that is being restrained.  "If the purpose of the Rule of Reason is to determine whether a restraint is net procompetitive or net anticompetitive, accepting procompetitive effects in a collateral market disrupts that balancing.  It weakens antitrust protections by permitting defendants to rely on a broader array of justifications that promote competition, if at all, in collateral markets where the restraint under analysis does not occur."  *Id.* at 1269 (Smith, J. concurring).

87.    In any event, the natural experiment since *Alston* demonstrates that Defendants' prohibition on Academic Achievement Awards was not needed to protect consumer demand.  Today dozens of schools pay Academic Achievement Awards and college sports are more popular than ever.

88.    The first mover was the University of Mississippi, which announced in November 2021 that it would be providing $5,980 Academic Achievement Awards to all athletes who maintained academic eligibility in the 2021-22 school year.[7]

89.    Upon information and belief, as of the date of this Complaint, more than 50 Division I schools are paying Academic Achievement Awards to all eligible athletes on their teams, including: Alabama State University, Auburn University, Baylor University, Boise State University, Clemson University, Florida State University, Georgia Tech, Georgia Southern University, Indiana University-Bloomington, Iowa State University, Kansas State University, Kent State University, Louisiana State University, Mississippi State University, North Carolina State University, Northwestern University, Oklahoma State University, Oregon State University, Pennsylvania State University, Purdue University, San Jose State University, Texas Tech University, The Ohio State University, University of Alabama, University of Arizona, University of Arkansas-Fayetteville, University of California-Berkeley, University of California-Los Angeles, University of Colorado-Boulder, University of Florida, University of Georgia, University of Illinois Urbana-Champaign, University of Iowa, University of Kansas, University of Kentucky, University of Louisville, University of Miami, University of Michigan, University of Minnesota, University of Mississippi, University of Missouri, University of Nebraska-Lincoln, University of North Carolina-Chapel Hill, University of Oklahoma, University of Oregon, University of South Carolina, University of Southern California, University of

---

[7] Ross Dellenger, *Ole Miss Breaks Ground on Post-Alston Ruling 'Extra Benefits'*, Sports Illustrated (Nov. 20, 2021), https://www.si.com/college/2021/11/20/ole-miss-begins-extra-benefits-alston-ruling.

Tennessee-Knoxville, University of Texas at Austin, University of Virginia, University of Washington, University of Wisconsin-Madison, Virginia Tech, and West Virginia University.

90.     Many of these schools are providing the maximum $5,980 annual Academic Achievement Awards to every Division I athlete who maintains minimum academic eligibility under NCAA standards, including, but not limited to: Boise State University, Iowa State University, Mississippi State University, Oklahoma State University, University of Alabama, University of Arizona, University of Arkansas, University of Colorado, University of Miami, University of Mississippi, University of Nebraska, University of Oregon, University of South Carolina, University of Washington, University of Wisconsin, and West Virginia University.  Other schools have different eligibility requirements which apply to the athletes at their schools.

91.     Despite the widespread payment of these Academic Achievement Awards, fans continue to flock to college sports.  For example, the 2022 NCAA Division I men's basketball championship game, which was played while dozens of schools paid Academic Achievement Awards, was the most-viewed NCAA men's basketball championship game broadcast in history.[8]  And the 2023 Women's NCAA March Madness tournament, which was played while even more schools paid Academic Achievement Awards, shattered television records.[9]

92.     The NCAA, the Conference Defendants, and their members schools, have continued to generate billions of dollars a year in revenues from Division I sports despite the availability of Academic Achievement Awards.  Fan, consumer and sponsor interest in Division I sports has never been higher.  Just this past year, the Big Ten entered into its largest television contract ever, which, beginning in July 2023, will pay the conference more than $1 billion a year for the next seven years.[10]

---

[8] *2022 DI men's basketball championship game sets single-game viewing records*, NCAA (Apr. 5, 2022), https://www.ncaa.com/news/basketball-men/article/2022-04-05/2022-di-mens-basketball-championship-game-sets-single-game-viewing-records.

[9] Sean Medow, *NCAA women's basketball breaks ESPN viewership records*, SportBusiness (Mar. 29, 2023), https://www.sportbusiness.com/news/ncaa-womens-basketball-breaks-espn-viewership-records/.

[10] Adam Rittenberg, *Big Ten completes 7-year, $7 billion media rights agreement with Fox, CBS, NBC*, ESPN (Aug. 18, 2022), https://www.espn.com/college-football/story/_/id/34417911/big-ten-completes-7-year-7-billion-media-rights-agreement-fox-cbs-nbc.

**VIII.   THERE WERE SUBSTANTIALLY LESS RESTRICTIVE ALTERNATIVES TO DEFENDANTS' ANTICOMPETITIVE AGREEMENTS**

93.     This Court in *Grant-in-Aid Cap* further found that allowing Academic Achievement Awards up to the maximum amount that the NCAA already permitted an individual athlete to receive for athletic participation would be "virtually as effective" in serving any procompetitive purposes of the NCAA's rules barring such Academic Achievement Awards, which could be implemented without significantly increased cost.  375 F. Supp. 3d at 1109.  First the Ninth Circuit and then the unanimous Supreme Court affirmed these findings.  *Grant-in-Aid Cap II*, 958 F.3d 1239 (9th Cir. 2020); *NCAA v. Alston*, 141 S. Ct. 2141 (2021).

94.     Because the *Grant-in-Aid Cap* litigation provided each Defendant here the full and fair opportunity to litigate the issue of the availability of the less restrictive alternative of allowing schools to offer Academic Achievement Awards in any amount up to the maximum amount permitted by the NCAA for athletic performance awards ($5,980), under principles of collateral estoppel, the final judgment in *Grant-in-Aid Cap*, as affirmed by the Ninth Circuit and the Supreme Court, precludes the Defendants from relitigating that issue here.

95.     In any event, the natural experiment since *Alston* reaffirms that permitting schools to offer Academic Achievement Awards to all Division I athletes in an amount up to $5,980 each year is a substantially less restrictive alternative to banning such Awards while being virtually as effective in achieving any asserted procompetitive justification without significantly increased cost.  Specifically, as described herein, there has been no harm to consumer demand for college sports as a result of the multitude of schools exercising their prerogative to pay Academic Achievement Awards up to $5,980. Indeed, consumer demand for college sports continues to grow.

## IX.     CLASS ALLEGATIONS

96.     Plaintiffs Chuba Hubbard and Keira McCarrell bring this action under Federal Rule of Civil Procedure 23(b)(3) on their own behalf and on behalf of the following Class:

> All current and former NCAA athletes who competed on a Division I athletic team at any time between April 1, 2019 and the date of class certification who would have met the requirements for receiving an Academic Achievement Award under the criteria established by their schools for qualifying for such an Award.  The Class excludes individuals who released their damages claims as part of the Settlement Agreement in

24

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*, No. 14-md-02541-CW (N.D. Cal. Dec. 6, 2017), ECF No. 746.

This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

97.   On behalf of the members of the Class, Plaintiffs seek the Academic Achievement Award compensation that members of this Class would have received absent Defendants' unlawful conduct.

98.   Plaintiffs seek certification of a nationwide class for their claims.

99.   The Class is so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are several thousand members of the Class.

100.   Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and other members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein. Each Class member attended a school which decided to offer Academic Achievement Awards after the NCAA rules prohibiting such Awards were eliminated.  Each Class member would have qualified for one or more such Awards under her or his schools' criteria.

101.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

102.   Numerous common questions of law and fact exist as to all members of the Class, and these common questions predominate over any questions affecting solely individual members of the Class.  Although in many cases the Defendants admit that they have in fact engaged in the conduct listed below, among the questions of law and fact common to the Class are:

a.  Whether Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by prohibiting cash compensation in the form of Academic Achievement Awards;

b.  Whether such concerted conduct caused members of the Class to be deprived of Academic Achievement Awards which they would have received in a competitive market;

c.  The duration of the contract, combination, or conspiracy alleged herein;

d.  Whether Defendants violated Section 1 of the Sherman Act, including whether principles of collateral estoppel preclude Defendants from contesting liability in this action;

e.  Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and Class members; and

f.  The appropriate measure of damages sustained by Plaintiffs and Class members.

103.   Plaintiffs' claims are typical of the Class because the restraints on Academic Achievement Awards have injured both Plaintiffs and the members of the Class.  Defendants' prior restrictions on Academic Achievement Awards applied to all Class members in an identical manner.

104.   Plaintiffs are adequate representatives of the Class and will protect the claims and interests of the Class.  Plaintiffs do not have interests that conflict with those of the Class and Plaintiffs will vigorously prosecute the claims alleged herein.

105.   A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.  The damages suffered by Plaintiffs and the members of the Class are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent class certification, it would not be feasible for Plaintiffs and members of the Class to redress the wrongs done to them.  It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases.  Further, individual litigation presents the potential for inconsistent or

contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## X.     ANTITRUST ALLEGATIONS

106.     Defendants' contract, combination, and conspiracy described herein consisted of a continuing horizontal agreement, understanding, and concert of action among the Defendants and their co-conspirators, the purpose and effect of which was to artificially fix, depress, maintain, and/or stabilize prices received by Plaintiffs and Class members for their athletic services in the United States, its territories and possessions.

107.     Defendants are barred by principles of collateral estoppel from contesting antitrust liability in this action under Section 1 of the Sherman Act due to the judgment establishing such liability in *Grant-in-Aid Cap*; *each* Defendant had a full and fair opportunity to litigate—and did litigate—this issue in *Grant-in Aid Cap.*

108.     Defendants are precluded, under principles of collateral estoppel, from contesting the anticompetitive effect of the restraints at issue or arguing that there is any procompetitive benefit to limiting the amount of Academic Achievement Awards to less than the cap on athletics participation awards—currently $5,980.  Defendants are also precluded under principles of collateral estoppel from contesting the finding that permitting Academic Achievement Awards up to this amount is a substantially less restrictive alternative that is virtually as effective in achieving any procompetitive justification that might be asserted for the prior rule banning all such Academic Achievement Awards without significantly increased cost.

109.     Alternatively, because the federal judiciary has "amassed considerable experience with the type of restraint at issue"—Defendants' prohibition on education-related benefits, including Academic Achievement Awards—"and can predict that it would be invalidated in all or almost all instances," the Court should find that Defendants' prohibition on Academic Achievement Awards was unlawful *per se* or constituted an unreasonable restraint of trade under the "quick look" rule of reason

with respect to Plaintiffs and all members of the Class.  *Alston*, 141 S.Ct. at 2156 (citations and quotations omitted).

110.    As a second alternative, this Court should find that Defendants' concerted conduct banning Academic Achievement Awards constituted an unreasonable restraint of trade under the rule of reason with respect to Plaintiffs and all Class members.

## XI.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade**

111.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

112.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a horizontal contract, combination, and conspiracy in restraint of trade in the relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Class for their athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

113.    Defendants' unlawful conduct deprived Plaintiffs and members of the Class of Academic Achievement Award payments.  This unreasonable restraint suppressed competition for Plaintiffs' and Class members' athletic services.

114.    Plaintiffs and the members of the Class received less compensation than they otherwise would have received in a competitive marketplace and seek to recover damages for the injuries they suffered to their business and property as a result of being deprived of the competitive opportunity to receive Academic Achievement Awards.

115.    Defendants and their co-conspirators' prohibition on all Academic Achievement Awards for Division I athletes during the damages period was not justified by any procompetitive objective.  Defendants' actions were solely to enhance revenue and control costs for themselves and their members.  The challenged rules did not further any alleged goal of "amateurism," or any other

claimed procompetitive purpose.  The NCAA's actions substantially restrained competition in the relevant labor markets for Division I athletes' services identified in this Complaint.  Moreover, there were substantially less restrictive alternatives capable of achieving any asserted procompetitive justification for the challenged restraints in a manner that would be virtually as effective and without significantly increased cost.

116.    As a direct and proximate result of Defendants' unlawful restraints, Plaintiffs and the members of the Class were injured and financially damaged.  Plaintiffs' and Class members' injuries consist of being deprived of the Academic Achievement Awards which they would have qualified for in a competitive market had the challenged restraints not prohibited all NCAA members from offering such Academic Achievement Awards.  Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

117.    Defendants are precluded from contesting their liability for the challenged restraints on Academic Achievement Awards under Section 1 of the Sherman by principles of collateral estoppel.

118.    Alternatively, Defendants' challenged restraints on Academic Achievement Awards should be determined to be either *per se* unlawful, or unlawful under the quick look rule of reason given the experience which the courts have now had in evaluating the legality of such restraints.  Or, such restraints should be found unlawful under a full rule of reason analysis.

119.    The amount of damages suffered by Plaintiffs and the members of the Class has not yet been ascertained.  Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, request judgment as follows:

A.    For actual damages according to the proof at trial;

B.    For treble damages pursuant to 15 U.S.C. § 15;

C.      For an order that Defendants are barred by the doctrine of offensive collateral estoppel from relitigating the question of whether their rules prohibiting the payment of Academic Achievement Awards cause anticompetitive effects for which there is no procompetitive justification and for which there are less restrictive alternatives so that liability under Section 1 of the Sherman Act cannot be contested;

D.      For an order that the Defendants' rules and agreements that operated to restrict athletes from receiving Academic Achievement Awards violated Section 1 of the Sherman Act;

E.      For Plaintiffs' reasonable attorneys' fees, costs, and expenses; and

F.      For other such relief that the Court may deem just and equitable.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby request a jury trial on any and all claims so triable.


Dated:  April 04, 2023,                         Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP         WINSTON & STRAWN LLP

By:  _/s/ Benjamin J. Siegel_                   By:  _/s/ Jeanifer E. Parsigian_
Benjamin J. Siegel (SBN 256260)                 Jeanifer E. Parsigian (SBN 289001)
715 Hearst Avenue, Suite 202                    101 California Street
Berkeley, CA 94710                              San Francisco, CA 94111
Telephone: (510) 725-3000                       Telephone: (415) 591-1000
Facsimile: (510) 725-3001                       Facsimile: (415) 591-1400
bens@hbsslaw.com                                jparsigian@winston.com


Steve W. Berman (*pro hac vice* forthcoming)    Jeffrey L. Kessler (*pro hac vice* forthcoming)
Emilee N. Sisco (*pro hac vice* forthcoming)    David L. Greenspan (*pro hac vice* forthcoming)
Stephanie A. Verdoia (*pro hac vice*            Adam I. Dale (*pro hac vice* forthcoming)
forthcoming)                                    200 Park Avenue
1301 Second Avenue, Suite 2000                  New York, NY 10166-4193
Seattle, WA 98101                               Telephone: (212) 294-4698
Telephone: (206) 623-7292                       Facsimile: (212) 294-4700
Facsimile: (206) 623-0594                       jkessler@winston.com
steve@hbsslaw.com                               dgreenspan@winston.com
emilees@hbsslaw.com                             aidale@winston.com
stephaniev@hbsslaw.com


*Counsel for Plaintiffs and the Proposed Class*