Steve W. Berman (*pro hac vice*)
Emilee N. Sisco (*pro hac vice*)
Stephanie A. Verdoia (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
emilees@hbsslaw.com
stephaniev@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

*Class Counsel*

Jeffrey L. Kessler (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Sofia Arguello (*pro hac vice*)
Adam I. Dale (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
sarguello@winston.com
aidale@winston.com

Jeanifer E. Parsigian (SBN 289001)
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
jparsigian@winston.com

*Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| CHUBA HUBBARD and KEIRA MCCARRELL, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; ATLANTIC COAST CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG 12 CONFERENCE, INC.; PAC-12 CONFERENCE; and SOUTHEASTERN CONFERENCE,<br><br>Defendants. | Case No. 4:23-cv-01593-CW<br><br>**NOTICE OF MOTION AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND SERVICE AWARDS FOR CLASS REPRESENTATIVES**<br><br>Date:     April 7, 2025<br>Time:    10:00 am<br>Judge:   Hon. Claudia Wilken<br>Courtroom: 2, 4th Floor |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................... 1

I.    BACKGROUND ...................................................................................................... 2

    A.    The Work Undertaken by Class Counsel ................................................... 2

          1.    Class Counsel Obtained Substantial Discovery on Behalf of the Settlement Class ............................................................................ 5

               a.    Written and Document Discovery ........................................ 5

               b.    Depositions ........................................................................... 6

          2.    Class Certification .............................................................................. 6

          3.    Summary Judgment ............................................................................ 7

    B.    The *Hubbard* Settlement ........................................................................... 7

II.    ARGUMENT .......................................................................................................... 9

    A.    The Court Should Award Class Counsel 20% of the $200 Million Common Settlement Fund ........................................................................ 10

          1.    Class Counsel Obtained Unprecedented Results ............................. 12

          2.    Class Counsel's Efforts Generated Non-Monetary Benefits for the Class ...................................................................................... 13

          3.    Pursuing This Litigation on a Contingency Basis Was Risky, Especially Given the Legal Challenges to Class Certification ....... 13

          4.    Class Counsel Experienced Significant Burdens While Litigating the Case ........................................................................... 15

          5.    The Market Supports the Requested Fee .......................................... 15

          6.    The Size of the Settlement Fund Does Not Justify a Reduction of the Fee Award Percentage ........................................................... 17

          7.    A Lodestar Cross-check Is Not Warranted Under the Circumstances of This Case ............................................................. 18

    B.    Class Counsel's Expenses Are Reasonable and Were Necessarily Incurred .................................................................................................... 20

    C.    Service Awards Should be Granted to the Class Representatives .............. 21

III.    CONCLUSION .................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amador v. Baca,*
    2020 WL 5628938 (C.D. Cal. Aug. 11, 2020)............................................................. 11

*Andrews v. Plains All American Pipeline L.P.,*
    2022 WL 4453864 (C.D. Cal. Sept. 20, 2022) ...................................................... *passim*

*In re Anthem, Inc. Data Breach Litig.,*
    2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) .............................................................. 10

*In re Apple Inc. Device Performance Litig.,*
    50 F.4th 769 (9th Cir. Sept. 28, 2022) ........................................................................ 21

*In re: Aqueous Film-Forming Foams Prod. Liab. Litig.,*
    2024 WL 4868615 (D.S.C. Nov. 22, 2024)................................................................... 20

*In re Auto. Refinishing Paint Antitrust Litig.,*
    617 F. Supp. 2d 336 (E.D. Pa. 2007) .......................................................................... 13

*Bellinghausen v. Tractor Supply Co.,*
    306 F.R.D. 245 (N.D. Cal. 2015).................................................................................. 10

*Benson v. DoubleDown Interactive, LLC,*
    2023 WL 3761929 (D. Wash. June 1, 2023) ....................................................... *passim*

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ....................................................................................... 20

*In re Capacitors Antitrust Litig.,*
    2018 WL 4790575 (N.D. Cal. Sept. 21, 2018) ..................................................... 10, 20

*Carpenters Health & Welfare Fund v. Coca-Cola Co.,*
    587 F. Supp. 2d 1266 (N.D. Ga. 2008) ....................................................................... 16

*Carter v. NCAA,*
    No. 4:23-cv-6325-RS (N.D. Cal.)...................................................................... *passim*

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
    2016 WL 183285 (N.D. Cal. Jan. 14, 2016)............................................................... 18

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
    2016 WL 3648478 (N.D. Cal. July 7, 2016)............................................................... 12

*In re Checking Account Overdraft Litig.,*
    830 F. Supp. 2d 1330 (S.D. Fla. 2011) ....................................................................... 16

*Ching v. Siemens Indus.*,
    2014 WL 2926210 (N.D. Cal. June 27, 2014) ............................................................. 13

*In re College Athlete NIL Litig.*,
    No. 4:20-cv-03919-CW (N.D. Cal.) ............................................................. 1, 3, 4, 8

*Craft v. Cnty. of San Bernardino*,
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) ............................................................. 18

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
    2023 WL 8445812 (N.D. Cal. Oct. 10, 2023) ............................................. 2, 9, 16, 17

*Farrell v. Bank of America Corp., N.A.*,
    827 F. App'x 628 (9th Cir. 2020) ............................................................. 2, 11, 18, 19

*Fischel v. Equitable Life Assur. Soc'y of the United States*,
    307 F.3d 997 (9th Cir. 2002) ............................................................. 9

*George v. Acad. Mortg. Corp. (UT)*,
    369 F. Supp. 3d 1356 (N.D. Ga. 2019) ............................................................. 15

*Glass v. UBS Financial Services, Inc.*,
    2007 WL 221862 (N.D. Cal. 2007) ............................................................. 18, 19

*Hartless v. Clorox Co.*,
    273 F.R.D. 630 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012) ............ 20

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ............................................................. 12

*In re High-Tech Emp. Antitrust Litig.*,
    2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ............................................................. 22

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) ............................................................. 12

*In re Hyundai & Kia Fuel Economy Litig.*,
    926 F.3d 539 (9th Cir. 2019) (en banc) ............................................................. 10

*In re Initial Public Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................. 16

*Jenson v. First Tr. Corp.*,
    2008 WL 11338161 (C.D. Cal. June 9, 2008) ............................................................. 15, 19

*In re Korean Air Lines Co., Antitrust Litig.*,
    2013 WL 7985367 (C.D. Cal. Dec. 23, 2013) ............................................................. 10

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa. June 2, 2004) ............................................................. 13

*In re Lithium Ion Batteries Antitrust Litig.*,
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ................................................................. 12, 13, 14

*Lowery v. Rhapsody Int'l, Inc.*,
    75 F.4th 985 (9th Cir. 2023) ................................................................................................ 12

*In re M.D.C. Holdings Sec. Litig.*,
    1990 WL 454747 (S.D. Cal. Aug. 30, 1990) ........................................................................ 15

*Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*,
    2014 WL 12738907 (E.D. Pa. July 14, 2014) ...................................................................... 22

*In re Motorsports Merch. Antitrust Litig.*,
    112 F. Supp. 2d 1329 (N.D. Ga. 2000) ................................................................................ 13

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................................... 14

*In re NCAA Athletic Grant-In-Aid Cap Antitrust Litig.*,
    No. 4:14-md-02541-CW (N.D. Cal.) ...................................................................................... 3

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .............................................................. *passim*

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd sub nom. NCAA v. Alston*, 594 U.S.
    69 (2021) ..................................................................................................................... *passim*

*In re NCAA Student-Athlete Name & Likeness Litig.*,
    No. 4:09-cv-01967-CW (N.D. Cal.) ........................................................................................ 3

*O'Bannon v. NCAA*,
    No. 4:09-cv-03329-CW (N.D. Cal.) ........................................................................................ 3

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................................ 12

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) .......................................................................................... 10, 20

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    959 F.3d 922 (9th Cir. 2020) ............................................................................................ *passim*

*Rankin v. Am. Greetings, Inc.*,
    2011 WL 13239039 (E.D. Cal. July 6, 2011) ...................................................................... 19

*Reyes v. Experian Info. Sols., Inc.*,
    856 F. App'x 108 (9th Cir. 2021) ......................................................................................... 18

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................................ 21

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ............................................................. 21

*Steiner v. Am. Broad. Co.*,
    248 F. App'x 780 (9th Cir. 2007) ...................................................... 13

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011).............................................................. 12

*In re Super. Beverage/Glass Container Consol. Pretrial*,
    133 F.R.D. 119 (N.D. Ill. 1990)......................................................... 14

*In re Syngenta AG MIR 162 Corn Litig.*,
    357 F. Supp. 3d 1094 (D. Kan. 2018), *aff'd* 2023 WL 2262878 (10th Cir. Feb. 28,
    2023) ............................................................................... 9, 16, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) ................................... 9, 16, 18

*Thomas v. Dun & Bradstreet Credibility Corp.*,
    2017 WL 11633508 (C.D. Cal. Mar. 22, 2017)................................... 19

*In re Titanium Dioxide Antitrust Litig.*,
    2013 WL 6577029 (D. Md. Dec. 13, 2013)........................................ 22

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ................................................ *passim*

*Wal-Mart Stores v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)................................................................ 14

*Weeks v. Kellogg Co.*,
    2013 WL 6531177 (C.D. Cal. Nov. 23, 2013) ................................... 22

*Williams v. Rohm & Haas Pension Plan*,
    658 F.3d 629 (7th Cir. 2011) ............................................................ 19

### OTHER AUTHORITIES

Alba Conte, Herbert B. Newberg, William Rubenstein, *Newberg and Rubenstein on
    Class Actions* § 15:81 (6th ed. 2022) .............................................. 17

American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b)
    (2010)............................................................................................... 11

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee
    Awards* J. EMPIRICAL L. STUD. 811, 824 (2010) .......................... 13

Fed. R. Civ. P. 23 ......................................................................................... 6

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE that on April 7, 2025, at 10:00 a.m., in the courtroom of the

3 Honorable Claudia Wilken of the United States District Court of the Northern District of California,

4 located at 1301 Clay Street, Courtroom 2 – 4th Floor, Oakland, CA 94612, plaintiffs will and hereby

5 do move the Court for an order:

6      1.      Awarding Class Counsel $40 million in attorneys' fees;

7      2.      Approving reimbursement of $338,632.44 in expenses and costs incurred by Class

8              Counsel; and

9      3.      Approving an incentive award of $50,000 for each of the two Class Representatives.

10      This motion is based on this notice of motion and motion, the accompanying memorandum

11 of points and authorities, the declarations in support of the motion, argument by counsel at the

12 hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be

13 presented at the hearing of this motion, and all papers and records on file in this matter.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## STATEMENT OF ISSUES

2     1)  Class Counsel have dedicated over $4.7 million in contingent attorney and professional time

3  to this matter. Counsel now seek an attorneys' fee award in the amount of $40 million, which

4  represents 20% of the common settlement fund. Should this Court exercise its discretion to approve

5  the fee request as fair and reasonable when Class Counsel obtained an exceptional result that will

6  provide injured class members with approximately 66% of their actual damages before fees and

7  expenses are deducted?

8     2)  Class Counsel have advanced $338,632.44 in out-of-pocket expenses in this litigation, mainly

9  attributable to the costs of essential experts. Should the Court approve reimbursement of this amount

10  as fair and reasonable?

11     3)  Should the Court grant a $50,000 incentive award to each of the two Class Representatives for

12  their work and personal risks in helping attain an exceptional settlement for class members?

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-cv-01593-CW

1

## I.    INTRODUCTION

2

3      The $200 million non-reversionary common fund from which Winston & Strawn LLP

4  ("Winston") and Hagens Berman Sobol Shapiro LLP ("Hagens Berman,") (collectively "Class

5  Counsel") seek fees is the result of two years of extensive litigation and over a decade of Class

6  Counsel's broader efforts on behalf of college athletes challenging Defendants' restraints on college

7  athlete compensation. If finally approved, this settlement will reimburse college athletes who

8  competed on a Division I athletic team at any time between April 1, 2019, and September 15, 2024,

9  and would have earned Academic Achievement Awards (or "Awards"), absent Defendants' rules and

10  agreements prohibiting such compensation, which this Court previously struck down. *See In re NCAA*

11  *Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058 (N.D. Cal. 2019), *aff'd sub nom.*

12  *NCAA v. Alston*, 594 U.S. 69 (2021). This settlement is also part of Class Counsel's broader litigation

13  campaign in *House* and *Carter* that will collectively force Defendants to end decades-old restraints on

14  college athlete compensation, and fundamentally reform college sports into a more equitable system

15  for the athletes.

16      The extraordinary benefits provided to class members by the settlement is self-evident: the

17  $200 million common fund (the "Settlement Fund") represents nearly **two-thirds** of the Settlement

18  Class's single damages claims—far beyond typical recoveries in antitrust class actions. *See*

19  Declaration of Brian T. Fitzpatrick (filed concurrently herewith) ("Fitzpatrick Decl."), ¶ 33. Moreover,

20  Class Counsel faced significant risks in achieving this victory, operating on a contingency basis and

21  working tirelessly to meet the Court's fast-paced schedule, conducting extensive discovery and fully

22  briefing class certification in less than six months, while simultaneously engaging in contentious and

23  extensive settlement discussions. The litigation also presented individualized proof issues that created

24  reasonable uncertainty of whether the Court would have certified a class in this case. In light of the

25  substantial risks and complex issues Class Counsel faced in this litigation, as well as the excellent

26  monetary result obtained for the Settlement Class, Class Counsel seeks an Order: (i.) awarding it 20

27  percent of the $200 million non-reversionary Settlement Fund ($40 million) as fees, paid over a ten-

28  year period; (ii) granting reimbursement of $338,632.44 to cover the out-of-pocket litigation expenses

1

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

1    incurred in connection with prosecuting this litigation; and (iii) awarding incentive awards of $50,000

2    to each Class Representative.

3    The attorneys' fees requested are warranted under the percentage-of-the-fund analysis, which

4    is the preferred methodology when common funds have been created for the class. *See* Fitzpatrick

5    Decl. ¶¶ 14–16.  Class Counsel's fee request is below the 25% starting benchmark in the Ninth Circuit

6    and is consistent with fee percentages courts across the circuits have approved in other "megafund"[1]

7    cases. *See, e.g.*, *Benson v. DoubleDown Interactive, LLC*, 2023 WL 3761929, at *1–3 (D. Wash. June

8    1, 2023) (awarding almost 29.3% of $415 million settlement fund); *Grant-in-Aid*, 2017 WL 6040065,

9    at *2 (N.D. Cal. Dec. 6, 2017) (noting that "of the 19 antitrust settlements between 2009 and 2013,

10   with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median

11   fee percentages were 27% and 30%"); *In re Facebook, Inc. Consumer Privacy User Profile Litig.*,

12   2023 WL 8445812, at *2 (N.D. Cal. Oct. 10, 2023) (awarding 25% of a $725 million fund).

13   A lodestar cross-check is not required in the Ninth Circuit, especially in a case such as this

14   one, where the settlement was achieved quickly, and the case was part of a broader litigation campaign.

15   *See Farrell v. Bank of America Corp., N.A.*, 827 F. App'x 628, 630 (9th Cir. 2020) (observing that the

16   Ninth Circuit has found the lodestar crosscheck to be "inapplicable or unhelpful in certain specific

17   situations"); Fitzpatrick Decl. ¶¶ 14, 16, 41. But even if the Court does perform a lodestar crosscheck,

18   it would show the requested fee is reasonable, particularly when viewed in the context of the work

19   Class Counsel has done to benefit class members in interrelated cases. Fitzpatrick Decl. ¶¶ 49–54.

20   **I.    BACKGROUND**

21   **A.    The Work Undertaken by Class Counsel**

22   The settlement in *Hubbard* was the culmination of close to two years of litigation, which

23   included aggressively pursuing and analyzing a massive record of information from all Power Five

24   Conference member schools and many additional Division I schools, fully briefing class certification

25   in less than six months, negotiating a discovery process, and otherwise working tirelessly to meet the

26   Court's fast-paced schedule, ahead of the scheduled trial in December 2024. The litigation was also

27

28   [1] *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 932 (9th Cir. 2020) (noting that the Ninth Circuit has "not identified a bright-line definition for 'megafund,'" but that a settlement of $124.5 million qualified).

part of a broader litigation campaign spanning more than a decade, all of which were led by one or both Class Counsel, challenging Defendants' anticompetitive athlete compensation rules. *See, e.g.*, *O'Bannon v. NCAA*, No. 4:09-cv-03329-CW (N.D. Cal.); *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 4:09-cv-01967-CW (N.D. Cal.); *Grant-In-Aid*, No. 4:14-md-02541-CW (N.D. Cal.); *In re College Athlete NIL Litig.* ("*House*"), No. 4:20-cv-03919-CW (N.D. Cal.); *Carter v. NCAA*, No. 4:23-cv-6325-RS (N.D. Cal.). These cases have fundamentally reformed the compensation system for Division I athletes—introducing, among other things, direct cash payments to college athletes.

*Hubbard* was born from *Grant-in-Aid* (and the Supreme Court's *Alston* decision affirming *Grant-in-Aid*), where Class Counsel pursued and secured an injunction from this Court against NCAA rules prohibiting FBS football and Division I basketball players from receiving education-related compensation, including cash payments of up to $5,980 in academic or graduation awards or incentives (*i.e.*, the Academic Achievement Awards). *See Grant-in-Aid*, 375 F. Supp. 3d 1058. The injunctive relief obtained by Class Counsel was unanimously upheld by the Supreme Court and spurred a dramatic shift in the college sports landscape. *Alston*, 594 U.S. 69.[2] Indeed, following the Supreme Court's decision in *Alston*, the NCAA revised its Bylaws to allow *all* Division I athletes to receive Academic Achievement Awards.

The Court's injunction unlocked life-changing benefits for NCAA Division I athletes. While the injunction capped Academic Achievement Awards and did not require schools to pay them, with the categorical prohibition on cash payments removed, competition for athletes' services led many colleges to pay such Awards. Complaint ("Compl."), ECF No. 1, ¶ 4. By the time Class Counsel filed for class certification in this case, every single school in each of the Power Five Conferences, plus many schools in other conferences, including every school in the Big East, offered Academic Achievement Awards. *See* Plaintiffs' Motion for Class Certification ("Class Cert. Mot."), ECF No. 149, at 1.

While the *Alston* injunction was of great significance, it did not rectify the damages suffered

---

[2] It bears mention that Plaintiffs' counsel—which included Winston, Hagens Berman, and two other law firms—were only awarded roughly $36.4 million in attorneys' fees for the more than seven years spent working on the groundbreaking injunctive relief obtained in *Alston*. Class Counsel was not reimbursed, for example, for millions in expert costs that were critical to their success in that action.

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

1  by thousands of Division I athletes who went to schools that subsequently decided to offer Awards
2  following the elimination of the NCAA bylaws that unlawfully prohibited them. *Hubbard* sought to
3  rectify that.

4         Class Counsel began investigating this case several months before filing the complaint. These
5  time-intensive pre-suit efforts to determine the monetary relief that could be obtained for thousands of
6  athletes across the country included:

7       • Researching whether, and which, NCAA member schools were offering Academic
8         Achievement Awards, as well the criteria for eligibility for those Awards;

9       • Interviewing college athletes and prospective lead plaintiffs;

10      • Reviewing and assessing the *Grant-in-Aid* class definitions and damages settlement
11        agreement to identify any impact they may have on pursuing this case; and

12      • Retaining the services of experienced consultants to perform a substantial economic
         analysis of anticipated issues in the case, including any individualized issues that would
13        have to be overcome to obtain class certifications.

14        This work culminated in Class Counsel filing this action on April 4, 2023. *See generally*
15  *Compl.* Class Counsel has litigated extensively in support of the claims since then.

16        After Class Counsel filed the *Hubbard* complaint, the parties participated in four mediation
17  sessions in spring and summer 2023 to explore the possibility of an early settlement. Declaration of
18  Steve W. Berman in Support of Plaintiffs' Motion for Preliminary Settlement Approval ("Berman
19  Prelim. Settlement Decl.") (ECF No. 450-2), ¶ 6, *House*, No. 4:20-cv-03919 CW (N.D. Cal. July 26,
20  2024). Those discussions were unsuccessful. Thereafter, in October 2023, the Court set a fast-paced
21  case schedule for *Hubbard*, with trial set for December 2024—*i.e.*, less than 14 months later. *See* Oct.
22  26, 2023 Hr'g Tr. ("Case Mgmt. Conference Tr."), ECF No. 128, 6:9–11, 20:9–15. The Court further
23  encouraged the parties to accelerate the class certification process and engage in expedited and
24  informal discovery to provide Plaintiffs with the information necessary to meet the aggressive
25  deadlines. *Id.* 22:2–25, 23:10–18. In line with the Court's instruction, since November 2023, Class
26  Counsel devoted significant resources to prosecuting this case against vigorous opposition by
27  powerful, well-funded defendants who were represented by a half-dozen of the best law firms in the
28  world. A detailed description of the work performed by each firm seeking fees and reimbursement of

4

expenses is set forth in the individual Declarations of Class Counsel submitted in support of this motion.[3] Below is a summary of the work performed by Class Counsel.

### 1.    Class Counsel Obtained Substantial Discovery on Behalf of the Settlement Class

Despite Defendants' roadblocks along the way, Class Counsel succeeded in obtaining voluminous data on each school's Academic Achievement Award criteria and recipients and devoted substantial resources to evaluating that data for both class certification and merits analysis.

### a.    Written and Document Discovery

In light of the fast-paced case schedule, Class Counsel began propounding significant formal and informal discovery on Defendants less than one week after the Court's scheduling order and concluded fact discovery within just six months. This discovery included the production of the hundreds of thousands of documents that had been produced in *House* and *Grant-in-Aid*. Stipulation and Protective Order, ECF No. 142, at 2.

In addition, Plaintiffs pursued and obtained significant new discovery from Defendants, including multiple rounds of voluminous data—often provided in disparate formats and covering multiple years—on behalf of **over 100 NCAA schools** concerning their respective Awards policies, procedures and recipients. Stipulated Order, ECF No. 146; Kessler Decl. ¶ 5. When discovery disputes arose, Class Counsel worked swiftly to resolve such disputes. For example, Class Counsel drafted and sent to Defendant Atlantic Coast Conference Rule 30(b)(6) deposition and document subpoenas for third-parties Boston College and Syracuse University, which led to the production of important information from those schools. Kessler Decl. ¶ 6. Class Counsel did the same for third-party University of Virginia, and served those third-party subpoenas to address the Atlantic Coast Conference's then-deficient document production on behalf of that school.

Class Counsel spent over 1,000 hours reviewing and analyzing this extensive data. The importance of the effort to obtain this vital information from the non-party member institutions cannot be understated, given the detailed school-specific data required for Plaintiffs' damages assessments

---

[3] *See* Declaration of Jeffrey L. Kessler in Support of Plaintiffs' Mot. for Attorneys' Fees, Reimbursement of Litig. Expenses and Service Awards for Class Representatives ("Kessler Decl."); Declaration of Steve W. Berman in Support of Mot. for Attorneys' Fees, Reimbursement of Litig. Expenses and Service Awards for Class Representatives ("Berman Final Approval Decl.").

and class certification motion. Kessler Decl. ¶¶ 5, 6. Indeed, one of Defendants' primary attacks against class certification was the varying nature of the data, arguing that a school-by-school, or even an athlete-by-athlete, analysis was required to determine damages. Given this attack, it was critical for Plaintiffs to acquire and scrupulously analyze this comprehensive data, organize and digest the information, and coordinate with Plaintiffs' expert to develop a reliable damages model for class-wide recovery. This information also was central to Plaintiffs' ability to identify the proposed requirements for class membership and satisfy the Rule 23 requirements for class certification. *See, e.g.*, Class Cert. Mot. at 3. To limit costs, Plaintiffs' counsel relied on in-firm "review" attorneys who specialize in e-discovery and bill at substantially lower hourly rates than what is commonly charged for document review services. Kessler Decl. ¶ 9.

### b.    Depositions

The case required extensive fact and expert testimony to support class certification. Because Class Counsel was able to leverage the depositions taken in *Grant-in-Aid*, however, only four new depositions had to be taken in *Hubbard*. Specifically, Class Counsel prepared for and defended the depositions of Class Representatives Chuba Hubbard and Keira McCarrell and Plaintiffs' expert Dr. Daniel Rascher. Kessler Decl. ¶ 12. Class Counsel also prepared for and took the deposition of Defendants' expert, Dr. Justin McCrary, a highly experienced economist. *See* Defendants' Joint Opposition to Plaintiffs' Motion to Partially Exclude the Opinions, Report, and Testimony of Dr. Justin McRary, ECF No. 183, at 3. The testimony elicited in these depositions was essential to Plaintiffs' class certification briefing and ultimate success in settling the claims in this case.

### 2.    Class Certification

Class Counsel worked tirelessly to analyze the extensive data produced by the schools, perform legal research on class certification issues, including class-wide impact and damages, and work closely with their economic expert, Dr. Rascher, to complete class certification briefing (and accompanying *Daubert* briefing) and Dr. Rascher's expert report within just six months of the start of discovery. *See* Kessler Decl. ¶ 8.

Defendants vigorously opposed class certification with their expert, Dr. McCrary. Defendants emphasized in their opposition briefing the purportedly individualized and subjective eligibility

6

criteria for providing Academic Achievement Awards, which they asserted differed widely across institutions and have changed year-to-year. *See generally* Defendants' Joint Opposition to Plaintiffs' Motion for Class Certification, ECF No. 164. Defendants also attacked Plaintiffs' class-wide damages model and Dr. Rascher's before-and-after approach. The class certification briefing included not only the motion for class certification, an opposition, and a reply, but also *Daubert* motions by both sides.

As noted above, the experts on both sides were deposed. And Class Counsel spent significant time preparing for the class certification and *Daubert* motions hearings. The settlement was reached while Plaintiffs' class certification motion remained pending.

### 3.    Summary Judgment

To meet the demands of the Court's accelerated schedule in this case, which set the deadline for summary judgment for July 12, 2024, Class Counsel had to spend significant time on their summary judgment briefing while the class certification work was also ongoing.

The Court recognized at the parties' Case Management Conference that the liability issues in the case might be resolved at summary judgment if Plaintiffs could prove that Defendants' defenses were precluded by collateral estoppel. *See* Case Mgmt. Conference Tr. 6:12–18. Class Counsel did extensive work preparing an affirmative summary judgment motion on these liability issues, in which they spent significant time conducting legal and factual research to support their planned filing. Kessler Decl. ¶ 11; *see also* Class Cert. Mot. at 22. Defendants indicated they would vehemently oppose any summary judgment motion filed by Plaintiffs. *See* Case Mgmt. Conference Tr. 29:4.

### B.    The *Hubbard* Settlement

The extensive efforts that went into Plaintiffs' settlement negotiations of *Hubbard* and the related *House* and *Carter* litigations are described in detail in Plaintiffs' motions for preliminary approval of the settlements, and the supporting declarations. *See* Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement ("Prelim. Settlement Approval Mot."), ECF No. 227, at 2–3, 7–8; Declaration of Jeffrey L. Kessler in Support of Plaintiffs' Unopposed Motion for Preliminary Settlement Approval, ECF No. 227-2, ¶ 7; Berman Prelim. Settlement Decl. ¶¶ 4, 6. As set forth therein, the parties negotiated resolution of the claims during several in-person and telephonic mediation sessions conducted by renowned mediator Professor Eric D. Green, who has significant

1    experience mediating disputes involving challenges to the NCAA's compensation rules. Settlement

2    negotiations stretched over a year-and-a-half—from the fall of 2022 to spring 2024—and were

3    carefully structured based on the different claims and classes involved. *See* Berman Prelim. Settlement

4    Decl. ¶¶ 4, 6.

5        The settlement discussions were sequenced and compartmentalized to address injunctive relief

6    resolving the *House* (NIL) and *Carter* (pay-for-play) claims first, and then to negotiate separately for

7    each of the three sets of damages claims (*House*, *Carter* and *Hubbard*). *Id.* ¶¶ 8, 9. Plaintiffs made a

8    settlement demand, and conducted negotiations, separately with respect to the claims in *Hubbard*,

9    factoring in Dr. Rascher's damages estimates, the procedural posture of the case, and the litigation

10   risks of the case. *Id*. ¶ 8. Jeffrey Kessler, Steve Berman and David Greenspan were personally involved

11   in all of the formal and informal settlement negotiations, with many additional Winston and Hagens

12   Berman attorneys also working on potential agreements. Kessler Decl. ¶ 13. They worked extensively

13   with Dr. Rascher to develop the *Hubbard* settlement strategy and the damages that were negotiated.

14       Ultimately, Class Counsel was able to negotiate a $200 million common-fund settlement in

15   *Hubbard*—which amounts to nearly two-thirds of the single damages in this case. *See* Preliminary

16   Settlement Declaration of Daniel Rascher ("Rascher Decl."), ECF No. 227-5, ¶ 9. The settlement

17   allows eligible collegiate athletes who competed on a Division I athletic team at any time between

18   April 1, 2019 and September 15, 2024, and who would have earned Academic Achievement Awards

19   absent Defendants' rules prohibiting them, to receive payments.

20       On July 26, 2024, Plaintiffs moved for preliminary approval of the *Hubbard* settlement and to

21   direct notice to the Settlement Class. *See* Prelim. Settlement Approval Mot. After objections, briefing

22   and a hearing, Class Counsel submitted additional briefing. *See* ECF Nos. 236–37, 239, 242, 243. On

23   October 7, 2024, the Court preliminarily approved the terms of the *Hubbard* and *House*/*Carter*

24   Settlements. *See* Order Granting Plaintiffs' Motion for Preliminary Settlement Approval as Modified,

25   ECF No. 244.

26

27

28

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-cv-01593-CW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    ARGUMENT

Class Counsel seek an award of $40 million in attorneys' fees, reflecting 20 percent of the $200 million common Settlement Fund, to be paid out over the same ten-year period in which class members will receive payments. As with the award of attorneys' fees in any class action settlement, the Court must "assume the role of fiduciary for the class plaintiffs," so "[r]ubber-stamp approval, even in the absence of objections, is improper." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (internal citation omitted). The Court's scrutiny is welcome here. Class Counsel's requested fee falls below the 25% benchmark in the Ninth Circuit and is consistent with fee percentages courts across the circuits have approved in other megafund cases. *See Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1006 (9th Cir. 2002) (citation omitted) ("We have established a 25 percent 'benchmark' in percentage-of-the-fund cases that can be 'adjusted upward or downward to account for any unusual circumstances involved in [the] case.'"); *In re Facebook, Inc.*, 2023 WL 8445812, at *2 (awarding 25% of a $725 million fund); *Benson*, 2023 WL 3761929, at *1–3 (awarding almost 29.3% of $415 million settlement fund); *Grant-in-Aid*, 2017 WL 6040065, at *2 (noting that "of the 19 antitrust settlements between 2009 and 2013, with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median fee percentages were 27% and 30%"); *Andrews v. Plains All American Pipeline L.P.*, 2022 WL 4453864, at *4 (C.D. Cal. Sept. 20, 2022) (approving 32% fee award of $230 million settlement); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575003, at *1–2 (N.D. Cal. Dec. 27, 2011) (approving 30% fee award of $405.02 million settlement); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1116 (D. Kan. 2018), *aff'd* 2023 WL 2262878 (10th Cir. Feb. 28, 2023) (awarding a 33.333% fee award in a $1.41 billion settlement).

Class Counsel's requested fee is justified and reasonable in light of the results achieved for the class, the high degree of risk born by Class Counsel, and the significant efforts expended by Class Counsel in this litigation on the Court's expedited timeline (as well as all the efforts by Class Counsel over the last decade in the broader litigation campaign against the NCAA's compensations restraints). In addition, Class Counsel's expenses were necessary to prosecute this case and should be fully reimbursed. Finally, the Court should grant $50,000 incentive awards for each of the two Class

9

1  Representatives in *Hubbard* in recognition for their services to the class and the substantial risks they

2  bore in participating in this high-profile litigation on behalf of all class members.

3  **A.    The Court Should Award Class Counsel 20% of the $200 Million Common Settlement Fund**

4      In the Ninth Circuit, district courts may use either the "percentage-of-the-fund" or "lodestar"

5  method to calculate reasonable attorneys' fees. *See, e.g.*, *In re Hyundai & Kia Fuel Economy Litig.*,

6  926 F.3d 539, 570 (9th Cir. 2019) (en banc) ("No presumption in favor of either the percentage or the

7  lodestar method encumbers the district court's discretion to choose one or the other.") (internal citation

8  omitted); *In re Optical Disk Drive*, 959 F.3d at 929 ("District courts have discretion to choose which

9  method they use to calculate fees, but their discretion must be exercised to reach a reasonable result.").

10  Where, as here, the settlement includes a cash recovery or common fund, the percentage-of-the-fund

11  methodology is "preferred," including in megafund cases like this one. *In re Capacitors Antitrust

12  Litig.*, 2018 WL 4790575, at *2 (N.D. Cal. Sept. 21, 2018); *In re Anthem, Inc. Data Breach Litig.*,

13  2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) ("[The percentage approach] has been applied in

14  megafund cases like the one here.").[4] Whatever method is used, the ultimate question is whether "the

15  [fee] award, like the settlement itself, is reasonable." *In re Online DVD-Rental Antitrust Litig.*, 779

16  F.3d 934, 949 (9th Cir. 2015).

17      Professor Brian T. Fitzpatrick, a renowned class action expert, opines in his accompanying

18  declaration that the percentage-of-the-fund is the appropriate method to calculate the award in this

19  case. *See* Fitzpatrick Decl. ¶¶ 14–16. He explains that, among other things, the lodestar method has

20  fallen out of favor with courts across the country because "it did not align the interests of counsel with

21  the interests of their clients—to wit, counsel's recovery did not depend on how much as recovered,

22  but rather on how many hours could be spent on the case." *Id.* ¶ 14. The percentage-of-the-fund

23  approach has become the dominant methodology "precisely because it corrected the deficiencies of

24

---

25  [4] *See also In re Korean Air Lines Co., Antitrust Litig.*, 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23, 2013) ("The use of the percentage-of-the-fund method in common-fund cases is the prevailing practice in the Ninth Circuit for awarding attorneys' fees and permits the Court to focus on a showing that a fund conferring benefits on a class was created through the efforts of plaintiffs' counsel."); *see also Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 260 (N.D. Cal. 2015) ("Because this case involves a common settlement fund with an easily quantifiable benefit to the class, the Court will primarily determine attorneys' fees using the benchmark method.").

26

27

28

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of counsel with the interests of their clients because the greater the recovery, the more counsel receives." *See id.* ¶ 15. Using the percentage-of-the-fund method in this case is also in accord with the consensus opinion of class action scholars. *Id.* ¶ 16 (quoting American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) for the proposition that "a percentage-of-the-fund approach should be the method utilized in most common-fund cases").

The Ninth Circuit has laid out several factors courts may consider when assessing requests for attorneys' fees calculated pursuant to the percentage-of-recovery method: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; and (6) whether the case was handled on a contingency basis. *See In re Optical Disk Drive*, 959 F.3d at 930 (citing *Vizcaino*, 290 F.3d at 1048–50). In megafund cases, the Ninth Circuit also considers the size of the settlement fund as "one relevant circumstance to which courts must refer" when determining the reasonableness of a fee award. *Vizcaino*, 290 F.3d at 1047. Finally, courts may take into account class counsel's efforts across multiple related cases where they are all part of a broader litigation campaign. *See Benson*, 2023 WL 3761929, at *2.

The Court should focus its analysis on the factors relevant to the unique circumstances present here, which demonstrate that a 20 percent fee award is reasonable and justified. *See, e.g.*, *Farrell*, 827 F. App'x at 630 ("The district court considered the most pertinent factors influencing reasonableness, and it did not err in finding the fee award reasonable.") (internal quotations omitted); *Amador v. Baca*, 2020 WL 5628938, at *9 (C.D. Cal. Aug. 11, 2020) ("The Court will generally apply these factors in a manner which it believes effectively addresses the relevant circumstances in this class settlement and litigation."). Moreover, for the reasons explained above, as well as those discussed in further detail in Section III.A.7 *infra*, the lodestar methodology is not the desired method under these facts for determining whether counsel's fee request is reasonable and thus should not be used as a crosscheck or otherwise. But even if the Court were to apply the lodestar methodology as a "crosscheck," that analysis confirms the reasonableness of the fee request.

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

1          **1.      Class Counsel Obtained Unprecedented Results**

2          When determining an award of attorneys' fees in a class action, "the most important factor is

3    the results achieved for the class." *Grant-in-Aid*, 2017 WL 6040065, at *3; *Lowery v. Rhapsody Int'l,*

4    *Inc.*, 75 F.4th 985, 988 (9th Cir. 2023) ("The touchstone for determining the reasonableness of

5    attorneys' fees in a class action is the benefit to the class."); *In re Omnivision Techs., Inc.*, 559 F. Supp.

6    2d 1036, 1046 (N.D. Cal. 2008) ("The overall result and benefit to the class from the litigation is the

7    most critical factor in granting a fee award."); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)

8    (noting that "the most critical factor" in determining the reasonableness of an attorneys' fees request

9    is "the degree of success obtained"). Typically, courts "aim to tether the value of an attorneys' fees

10   award to the value of the class recovery." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir.

11   2013). In a common fund case in which class counsel seek an award as a percentage of the fund, "this

12   task is fairly effortless. The district court can assess the relative value of the attorneys' fees and the

13   class relief simply by comparing the amount of cash paid to the attorneys with the amount of cash paid

14   to the class. The more valuable the class recovery, the greater the fees award." *Id.*

15         Here, the results achieved are exceptional. Class Counsel achieved an outstanding outcome for

16   the thousands of current and former student-athletes who comprise the class, obtaining nearly two-

17   thirds of the estimated actual damages (*see* Rascher Decl. ¶ 9)—far beyond many other approved

18   recoveries in antitrust class actions. *See* Fitzpatrick Decl. ¶ 33 ("Even in a run of the mill antitrust

19   class action case, these recoveries would be exceptional."); *see also In re: Cathode Ray Tube (CRT)*

20   *Antitrust Litig.*, 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016) (approving settlement

21   representing 20% of actual damages and citing a survey of 71 settled antitrust cases which showed a

22   weighted mean recovery of 19% of actual damages); *In re Lithium Ion Batteries Antitrust Litig.*, 2020

23   WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020) (describing a recovery of 11.7% of actual damages as

24   an "excellent" result and awarding class counsel just under 30% of the settlement fund); *Sullivan v.*

25   *DB Invs., Inc.*, 667 F.3d 273, 324 (3d Cir. 2011) (affirming approval of antitrust settlement providing

26   recovery of 12.5% of actual damages for one settlement class and 22.5% for another).

27

28

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

2.    **Class Counsel's Efforts Generated Non-Monetary Benefits for the Class**

While the monetary component of this settlement is the primary relief made available to the Settlement Class, the Court should consider that this class action, in combination with the Supreme Court victory in *Alston* and Class Counsel's broader litigation campaign in *House* and *Carter*, has required Defendants to eliminate their anticompetitive compensation rules, including their decades long prohibition on direct cash payments to college athletes, and fundamentally reformed college sports into a more equitable system for the athletes. *See* Fitzpatrick Decl. ¶¶ 6–9. These cases are all interrelated as part of the broader campaign by Class Counsel challenging the NCAA's compensation restraints. In any event, as Professor Fitzpatrick notes, only a minority of class action settlements include non-monetary benefits, so the fact that the *Hubbard* settlement is limited to a damages class should not weigh against the fee award. *See id.* ¶ 39 (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 824 (2010) (finding only 25% of settlements with non-monetary relief)).

3.    **Pursuing This Litigation on a Contingency Basis Was Risky, Especially Given the Legal Challenges to Class Certification**

In determining the appropriateness of a fee award, the next step is to consider the risk. That is, the amount of the fee depends in part on whether, and to what degree, "class counsel ran the risk of not being paid at all." *Steiner v. Am. Broad. Co.*, 248 F. App'x 780, 782 n.2 (9th Cir. 2007). Here, counsel worked entirely on a contingency basis. "Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an ***enhanced fee*** to compensate them for the risk that they might be paid nothing at all for their work." *Ching v. Siemens Indus.*, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014) (emphasis added); *see also Grant-in-Aid*, 2017 WL 6040065, at *4 (attorneys who take on the risk of a contingency case should be compensated for the risk they assume); *Benson,* 2023 WL 3761929, at *2 (finding that the "litigation was extremely risky" where class counsel "worked entirely on contingency").

"Antitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute." *In re Lithium Ion Batteries*, 2020 WL 7264559, at *15; *see also In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (the "antitrust

13

class action is arguably the most complex action to prosecute") (quoting *In re Motorsports Merch.*
*Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)); *In re Auto. Refinishing Paint Antitrust*
*Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) ("[A]ntitrust class action is arguably the most complex
action to prosecute. The legal and factual issues involved are always numerous and uncertain in
outcome.") (internal citation omitted). "The 'best' case can be lost and the 'worst' case can be won,
and juries may find liability but no damages. None of these risks should be underestimated." *In re*
*Lithium Ion Batteries*, 2020 WL 7264559, at *15 (quoting *In re Super. Beverage/Glass Container*
*Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990)); *see also Wal-Mart Stores v. Visa U.S.A., Inc.*,
396 F.3d 96, 118 (2d Cir. 2005) ("Indeed, the history of antitrust litigation is replete with cases in
which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible
damages, at trial, or on appeal.") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D.
465, 475 (S.D.N.Y. 1998)).

Even in light of the precedent from *Alston*, this litigation was challenging and risky, given the
class composition and purportedly individualized proof issues that threatened class certification.
Defendants argued that the 75 schools at issue implemented Academic Achievement Awards in highly
varied and diverse ways, which Defendants claimed presented individualized issues to impede class
certification. Class Counsel had to spend enormous efforts compiling and analyzing data and working
with their expert to come up with a reasonable class-wide damages methodology to fend off these
objections. While Class Counsel rebutted Defendants' arguments in their reply briefing in support of
class certification, there was a risk that the class would not be certified—or would be substantially
narrowed—as a result of Defendants' challenges. Moreover, Defendants made it clear they planned to
challenge Class Counsel's collateral estoppel arguments as to liability, which, if successful, would
have required the parties to re-litigate liability issues before a jury at trial.

In addition, the "bet-the-company" nature of Plaintiffs' challenges to Defendants'
compensation rules meant that Plaintiffs had to litigate against six well-resourced Defendants, and
their high-powered law firms who fought every issue tooth and nail. *See Benson*, 2023 WL 3761929,
at *2 (finding that prosecuting a line of several class actions against well-funded corporations
constituted a risk warranting an above-benchmark fee award).

14

1    Finally, since the inception of Class Counsel's litigation campaign, Defendants and their

2    members have aggressively lobbied Congress for legislation that could grant them an antitrust

3    exemption and/or end *Hubbard* and the other cases. Thus, not only did Class Counsel face the

4    significant risks attendant with most putative antitrust class actions, Class Counsel was also confronted

5    with the perpetual threat that it could come away with nothing because of legislative intrusion.

6    **4.    Class Counsel Experienced Significant Burdens While Litigating the Case**

7        For the same reasons this case carried very high risk, it also imposed significant "burdens on

8    class counsel while litigating the case." *In re Optical Disk Drive*, 959 F.3d at 930; *Vizcaino*, 290 F.3d

9    at 1050. Relevant burdens included proceeding with the representation on a contingency basis. *Benson*,

10   2023 WL 3761929, at *2. Moreover, Class Counsel had to work to meet the Court's fast-paced case

11   schedule. With trial scheduled for December 2024, full briefing on class certification was

12   accomplished in less than six months. Kessler Decl. ¶ 8. And at the time of settlement, Class Counsel

13   had undergone substantial preparation to file a summary judgment motion on the issue of Defendants'

14   liability, which included carefully reviewing the *Grant-in-Aid* record to ensure Plaintiffs could make

15   a collateral estoppel argument. Class Counsel engaged in these endeavors all while aggressively

16   pursuing the related *House* and *Carter* cases against Defendants as part of the years-long broader

17   litigation campaign challenging Defendants anticompetitive rules. *See Benson*, 2023 WL 3761929, at

18   *2 (citing work on related matters as a relevant burden).

19   **5.    The Market Supports the Requested Fee**

20       Although the Ninth Circuit has not adopted the full market-mimicking approach of other

21   circuits, "the market rate for the particular field of law" is still an important consideration. *In re Optical*

22   *Disk Drive*, 959 F.3d at 930. Here, a market-based analysis supports the reasonableness of both the

23   percentage method to calculate the fee and the specific percentage Class Counsel requests.

24       The market for high-stakes, high-value, plaintiff's-side litigators is driven by a percentage-of-

25   the-recovery model, with sophisticated clients typically incentivizing their lawyers by agreeing to a

26   fixed percentage of between 30% and 40% of the recovery. *See Jenson v. First Tr. Corp.*, 2008 WL

27   11338161, at *13 n.15 (C.D. Cal. June 9, 2008) ("If this were non-representative litigation, the

28   customary fee arrangement would likely be contingent, on a percentage basis, and in the range of 30%

15

to 40% of the recovery."); *In re M.D.C. Holdings Sec. Litig.*, 1990 WL 454747, at \*7 (S.D. Cal. Aug. 30, 1990) ("In private contingent litigation, fee contracts have traditionally ranged between 30% and 40% of the total recovery."); *George v. Acad. Mortg. Corp. (UT)*, 369 F. Supp. 3d 1356, 1382 (N.D. Ga. 2019) ("Plaintiffs request for approval of Class Counsel's 33% fee falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery"). As Professor Fitzpatrick notes, "[i]t is well known that standard contingency-fee percentages in individual litigation are one-third or greater." Fitzpatrick Decl. ¶ 40. The fee request here is well below such numbers.

Comparison to judicially approved fees can also be useful and supports the reasonableness of the percentage fee requested. *See* Fitzpatrick Decl. ¶¶ 26–32 (explaining why the 20% fee request here is consistent with the typical percentages awarded nationwide and in the Ninth Circuit). Class Counsel's requested fee award falls below the 25% benchmark in the Ninth Circuit and is consistent with fee percentages courts across the circuits have approved in dozens of other megafund cases. *See e.g.*, *In re Facebook, Inc.*, 2023 WL 8445812, at \*2 (awarding 25% of a $725 million fund); *Benson*, 2023 WL 3761929, at \*1–3 (awarding almost 29.3% of $415 million settlement fund); *Grant-in-Aid*, 2017 WL 6040065, at \*2 (noting that "of the 19 antitrust settlements between 2009 and 2013, with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median fee percentages were 27% and 30%"); *Andrews*, 2022 WL 4453864, at \*4 (approving 32% fee award of $230 million settlement); *In re TFT-LCD*, 2011 WL 7575003 (approving 30% fee award of $405.02 million settlement); *In re Syngenta AG MIR 162 Corn*, 357 F. Supp. 3d at 1115 (awarding a 33.333% fee award in a $1.41 billion settlement); *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 587 F. Supp. 2d 1266, 1271 (N.D. Ga. 2008) (finding attorneys' fees request of 21% of the $137.5 million settlement fund or $28,875,000 in attorney's fees reasonable) (securities class action); *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (approving 1/3 (33.3%) attorneys' fees request or $170,084,950 from net settlement of $586 million for class counsel in consolidated securities class action); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1358 (S.D. Fla. 2011) (approving class counsels' 30% fees request of a $410 million common fund settlement).

16

In sum, Class Counsel's request for a 20 percent fee award is consistent with the private market rate and other judicially approved settlements, even in megafund cases.

### 6.    The Size of the Settlement Fund Does Not Justify a Reduction of the Fee Award Percentage

Additionally, as case law indicates, and Professor Fitzpatrick explains, the size of the settlement here does not warrant a lower percentage award. *See* Fitzpatrick Decl. ¶¶ 27–30. The Ninth Circuit has "declined to adopt a bright-line rule" in megafund cases (*In re Optical Disk Drive*, 959 F.3d at 933) "requiring [the reduction or] the use of sliding-scale fee awards for class counsel" and "rejected the position that fee percentages must invariably fall as settlement amounts rise," (*In re Facebook, Inc.*, 2023 WL 8445812, at *2), recognizing the size of the settlement fund as only "one relevant circumstance to which courts must refer" when determining the reasonableness of a fee award. *Vizcaino*, 290 F.3d at 1047. The logic behind this consideration is set forth in *In re Optical Disk Drive*, where the Court noted that "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel," and cited other circuits' observation that "economies of scale could cause windfalls in common fund cases." 959 F.3d at 933; *but see* Alba Conte, Herbert B. Newberg, William Rubenstein, *Newberg and Rubenstein on Class Actions* § 15:81 (6th ed. 2022) (criticizing this approach because "the 'mega-fund' concept is a crude proxy for windfall as it may prove both under- and over-inclusive.").

The windfall concern expressed in *In re Optical Disk Drive* does not apply here, where the size of the recovery is plainly not "merely a factor of the size of the class." As discussed above and further in the Fitzpatrick Declaration, Class Counsel obtained a settlement that is well above the weighted mean percentages of single damages in other antitrust class actions—and courts in the Ninth Circuit have justified departures *upwards* from the 25% benchmark based on percentage recoveries far inferior to what Class Counsel obtained here. The fantastic results Class Counsel achieved in this case despite the risks to certification confirm that the requested fee award, while certainly significant, is not fairly characterized as a windfall and is thus not a reason to reduce the fees awarded. *See Benson*, 2023 WL 3761929, at *3 (citing *In re Optical Disk Drive*, 959 F.3d at 933 and holding that awarding 29.3% of a $415 million megafund was appropriate because "the size of the settlement fund is the result of Class

17

Counsel's exceptional efforts, not merely the size of the class" and "Class Counsel's requested fee award is well-earned and would not constitute an unjustified windfall").

Moreover, as the district court in *Benson* held, the size of the settlement fund must be weighed among all the other reasonableness factors and when those factors support the percentage requested, the size of the fund alone does not justify reducing the award. 2023 WL 3761929, at *2. Several decisions in the Ninth Circuit and elsewhere have reached the same conclusion. *See, e.g.*, *Andrews*, 2022 WL 4453864, at *4 (C.D. Cal. Sept. 20, 2022) (approving 32% fee award of $230 million settlement); *In re: Cathode Ray Tube (CRT)*, 2016 WL 183285, at *2 (N.D. Cal. Jan. 14, 2016) (approving 30% fee award of $127.45 million settlement); *In re TFT-LCD*, 2011 WL 7575003, at *2 (approving 30% fee award of $405.02 million settlement); *cf. Reyes v. Experian Info. Sols., Inc.*, 856 F. App'x 108, 110–11 (9th Cir. 2021) (finding error where district court relied on large settlement number ($25 million) to find that benchmark fee would be a windfall, without looking to circumstances of case); *In re Syngenta AG MIR 162 Corn*, 357 F. Supp. 3d at 1115 (awarding a 33.33% fee award in a $1.51 billion settlement after considering size of settlement and factors such as novelty and difficulty of the litigation, the results obtained, the absence of piggy-backing on a government investigation, and burden on class counsel).

### 7. A Lodestar Cross-check Is Not Warranted Under the Circumstances of This Case

Class Counsel submits that consideration of a lodestar in this case would not accurately account for the efforts Class Counsel contributed and the risks Class Counsel took toward the settlement it obtained for the class, would not be relevant to preventing a windfall, and would create perverse incentives for future class actions with regard to efficiency. For these reasons, the Court should not— and need not—conduct a lodestar cross-check.

The lodestar cross-check is not required in the Ninth Circuit. *See*, *e.g.*, *Farrell*, 827 F. App'x at 630 ("This Court has consistently refused to adopt a crosscheck requirement, and we do so once more."); *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) (quoting *Glass v. UBS Fin. Servs., Inc*., 2007 WL 221862, at *5, 16 (N.D. Cal. 2007)) (no lodestar cross-check conducted in an early settlement of the case, although 8 class members (out of 13,176) and the New

18

York attorney general objected to the settlement). Rather, a district court may appropriately determine that the circumstances of a given case warrant a certain percentage of the settlement fund without considering class counsel's lodestar. *Farrell*, 827 F. App'x at 630; *Benson*, 2023 WL 3761929, at *3 (declining to conduct a lodestar cross-check given the circumstances presented by that litigation); *Andrews*, 2022 WL 4453864, at *2 (declining to conduct a lodestar cross-check "[d]ue to the exceptional circumstances of this case" and the Court's extensive involvement in supervising the litigation). Courts routinely forego any lodestar crosscheck. Fitzpatrick Decl. ¶ 41 (noting that "only a minority of courts nationwide perform the crosscheck with the percentage method"); *see also Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011) (holding that "a lodestar check is not . . . required methodology" because "[t]he . . . argument . . . that any percentage fee award exceeding a certain lodestar multiplier is excessive . . . echoes the 'megafund' cap we rejected in *Synthroid*").

The unique circumstances here render a lodestar cross-check particularly unwarranted. *First*, this case is a continuation of the *Alston* litigation, and the settlement followed litigation of several interrelated cases that were part of a broader years-long litigation campaign challenging Defendants' compensation rules. *See* Fitzpatrick Decl. ¶¶ 6–12, 49, 53. In such situations, it is often difficult to attribute a lodestar to just one specific case, rendering application of a lodestar cross-check insufficient. *See, e.g.*, *Thomas v. Dun & Bradstreet Credibility Corp.*, 2017 WL 11633508, at *22 (C.D. Cal. Mar. 22, 2017) ("Courts have compensated class counsel for work performed in prior, related case where the work performed advanced [the instant] class action.") (alteration in original) (internal quotations omitted).

*Second*, the Ninth Circuit has excused application of the cross-check in situations, like this one, in which counsel achieved a meaningful settlement quickly. *See, e.g.*, *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) ("[I]n accordance with Ninth Circuit precedents, district courts within the Ninth Circuit have recognized that a lodestar cross check need not be performed where plaintiff's counsel achieves a significant result through an early settlement."); *see also Glass*, 2007 WL 221862, at *15 (N.D. Cal. Jan. 26, 2007) (where class counsel "achieved an excellent result for the class members by settling the instant action promptly," lodestar cross-check

was not used). The settlement in *Hubbard* was achieved in less than two years in large part because Class Counsel was building on work done in previous cases. To penalize this strong early result would encourage counsel to rack up lodestar work before settlement, which is contrary to policy goals encouraged by relying on the percentage of the fund method.

In any event, even if the Court chooses to perform a lodestar crosscheck of the $40 million in fees requested, that crosscheck would confirm that the fee request is reasonable. When courts do a lodestar crosscheck to assess a fee award, one of the factors considered is awards in similar cases. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941–42 (9th Cir. 2011). If the Court were to only include the lodestar from *Hubbard* of $4,793,070.00, the resulting lodestar multiplier in this case is 8.35. Professor Fitzpatrick explains that while multipliers in the largest settlements average less than 4, the lodestar multiplier here is "hardly unprecedented." *See* Fitzpatrick Decl. ¶¶ 46, 53; *see also Vizcaino*, 290 F.3d at 1051 n.6 (noting multipliers of up to 19.6). But, as Professor Fitzpatrick explains, it is largely arbitrary to draw the line for the lodestar crosscheck at Class Counsel's time sheets in *Hubbard*. Fitzpatrick Decl. ¶¶ 47, 52. All of these settlements are continuations of Class Counsel's victory in *Alston* and much of the discovery there was used here. If the Court examines Class Counsel's time (and fees) since *Alston* for any lodestar crosscheck here, the applicable multipliers would be below 6. Fitzpatrick Decl. ¶¶ 47, 53. Other courts have taken this approach with interrelated litigation that unfolded over time, such as in the multi-billion-dollar PFAS litigation before Judge Gergel. *See In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, 2024 WL 4868615, at *5 (D.S.C. Nov. 22, 2024) (using "[t]he lodestar for the total cumulative work performed by Class Counsel . . . from the DuPont, 3M, Tyco, and BASF actions" for the crosscheck).

## B.    Class Counsel's Expenses Are Reasonable and Were Necessarily Incurred

Counsel who have created a common fund for the benefit of a class are also entitled to be reimbursed for out-of-pocket expenses reasonably incurred in obtaining the settlement. *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012); *see, e.g.*, *In re Capacitors*, 2018 WL 4790575, at *6. As the Ninth Circuit has recognized, "litigation expenses make the entire action possible." *In re Online DVD-Rental*, 779 F.3d at 953.

Here, Class Counsel's unreimbursed expenses of $338,632.44 were reasonably incurred and

1    necessary for the litigation of the case. Berman Final Approval Decl. ¶¶ 9, 12; Kessler Decl. ¶¶ 29,

2    30, 32. In support of their reimbursement request, Class Counsel provide an accounting of the expenses

3    they incurred. *See* Kessler Decl., Ex. C; Berman Final Approval Decl., Ex. D. Several categories of

4    expenses are responsible for the overall spend, including fees paid or incurred to experts, online

5    document repositories, and travel in connection with the litigation. *See* Kessler Decl. ¶ 29; Berman

6    Final Approval Decl., Ex. D. Class Counsel advanced these necessary expenses, interest-free, without

7    assurance that they would be recouped. *See* Kessler Decl. ¶ 29; Berman Final Approval Decl., Ex. D.

8    This action could not have been litigated, much less to a successful resolution, without these critical

9    expenditures. *See* Kessler Decl. ¶ 29; Berman Final Approval Decl., Ex. D. Class Counsel respectfully

10   request that they be reimbursed in full.

11   **C.    Service Awards Should be Granted to the Class Representatives**

12   Finally, Class Counsel also request that the Court approve service awards for the *Hubbard*

13   Class Representatives. In recognition of their extensive contributions and commitments, Plaintiffs

14   request awards of $50,000 each for Chuba Hubbard and Keira McCarrell.

15   "Incentive awards are fairly typical in class action cases [to] . . . compensate class

16   representatives for work done on behalf of the class, to make up for financial or reputational risk

17   undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private

18   attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also In re*

19   *Apple Inc. Device Performance Litig.*, 50 F.4th 769, 786-87 (9th Cir. Sept. 28, 2022) (confirming that

20   reasonable incentive awards may be awarded). Courts have discretion to approve such awards based

21   on, *inter alia*, the financial or reputational risks undertaken in bringing the action, the notoriety and

22   personal difficulties encountered, the amount of time and effort spent, the duration of the litigation,

23   and the degree to which the class has benefitted from their actions. *Staton v. Boeing Co.*, 327 F.3d

24   938, 977 (9th Cir. 2003).

25   Here, both Class Representatives have been actively involved in this case from its inception.

26   Hubbard and McCarrell expended a substantial amount of time and effort over the past two years

27   assisting Class Counsel with the prosecution of their claims, including by meeting with counsel,

28   providing facts necessary for the preparation of the complaint, reviewing drafts of documents,

21

gathering and producing documents, preparing for and attending full-day in-person depositions, submitting declarations in support of the class certification motion, and reviewing and approving the settlement. *See* Kessler Decl. ¶¶ 20–24; Berman Final Approval Decl. ¶¶ 21–26; Declaration of Chuba Hubbard in Support of Plaintiffs' Mot. for Attorneys' Fees, Expenses and Service Awards ¶¶ 4, 5, 7; Declaration of Keira McCarrell in Support of Plaintiffs' Mot. for Attorneys' Fees, Expenses and Service Awards ¶¶ 4–5. Moreover, both *Hubbard* Class Representatives have been exposed to public scrutiny as a result of media attention associated with the case. *See Weeks v. Kellogg Co.*, 2013 WL 6531177, at *36 (C.D. Cal. Nov. 23, 2013) ("An incentive award is particularly appropriate where class representatives have attracted significant media attention and notoriety as a result of the litigation, and experienced personal difficulties as a result."). The extensive efforts and risks faced by Hubbard and McCarrell support the requested incentive awards, which are especially reasonable relative to the amount of the settlement that the Class Representatives helped secure. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *17–18 (N.D. Cal. Sept. 2, 2015) (approving incentive awards of $120,000 and $80,000 in $324.5 million settlement); *Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, 2014 WL 12738907, at *4 (E.D. Pa. July 14, 2014) (approving one $150,000 service award and two $75,000 service awards to class representatives in $130 million class action settlement); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to lead class representative out of $163.5 million settlement).

### III.    CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that their Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives be granted.

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW

1    Dated: December 17, 2024                Respectfully submitted,

2    HAGENS BERMAN SOBOL SHAPIRO LLP          WINSTON & STRAWN LLP

3    By:   */s/ Steve W. Berman*              By:   */s/ Jeffrey L. Kessler*
4          Steve W. Berman (*pro hac vice*)         Jeffrey L. Kessler (*pro hac vice*)
     Emilee N. Sisco (*pro hac vice*)         David L. Greenspan (*pro hac vice*)
5    Stephanie A. Verdoia (*pro hac vice*)    Sofia Arguello (*pro hac vice*)
     HAGENS BERMAN SOBOL SHAPIRO LLP          Adam I. Dale (*pro hac vice*)
6    1301 Second Avenue, Suite 2000           WINSTON & STRAWN LLP
     Seattle, WA 98101                        200 Park Avenue
7    Telephone: (206) 623-7292                New York, NY 10166-4193
     Facsimile:  (206) 623-0594               Telephone: (212) 294-4698
8    steve@hbsslaw.com                        Facsimile:  (212) 294-4700
     emilees@hbsslaw.com                      jkessler@winston.com
9    stephaniev@hbsslaw.com                   dgreenspan@winston.com
                                              sarguello@winston.com
10                                            aidale@winston.com
     Benjamin J. Siegel (SBN 256260)
11   HAGENS BERMAN SOBOL SHAPIRO LLP
     715 Hearst Avenue, Suite 300             Jeanifer E. Parsigian (SBN 289001)
12   Berkeley, CA 94710                       WINSTON & STRAWN LLP
     Telephone: (510) 725-3000                101 California Street, 34th Floor
13   Facsimile: ( 510) 725-3001               San Francisco, CA 94111
     bens@hbsslaw.com                         Telephone: (415) 591-1000
14                                            Facsimile:  (415) 591-1400
                                              jparsigian@winston.com
15
     *Class Counsel*
16                                            *Class Counsel*

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>

2

3

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

4

5

_____/s/ Jeffrey L. Kessler_____
JEFFREY L. KESSLER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR ATTY'S FEES & EXPENSES
No. 4:23-CV-01593-CW